## Case No. 16,707.

### UNITED STATES v. WILLIAMS et al.

[1 Cliff. 5.] [1]

Circuit Court, D. Maine.    April Term, 1858.

MURDER ON HIGH SEAS—INDICTMENT—NEW TRIALS —CONFESSIONS—PROOF OF CORPUS DELICTI.

1. An indictment for murder on the high seas is sufficient, although it describe the grand jury as "jurors of the United States."

2. Circuit courts of the United States have power to grant new trials, after conviction, for good cause shown, both in misdemeanors and felonies.
[Cited in Ex parte Lange, 18 Wall. (85 U. S.) 204; Sparf v. U. S., 156 U. S. 175, 15 Sup. Ct. 321.]

3. Whether the accused, in making confessions before the finding of the indictment, believed themselves to be speaking under oath or not is a question of fact for the jury.
[Cited in U. S. v. Stone, 8 Fed. 255.]

4. Where it is impossible to discover the body, the fact of death may be proved by other means.
[Cited in St. Clair v. U. S., 154 U. S. 152, 14 Sup. Ct. 1009.]
[Cited in Matthews v. State, 55 Ala. 187.]

5. When not made under oath, confessions of the accused are admissible in evidence, although the proof that the crime has been committed, is not, independent of the confessions, plenary.

Indictment for murder on the high seas. It appeared from the evidence that the prisoners sailed from Portland in the brig Albion Cooper, on the 7th of July, 1857, on a voyage to Cardenas, in the island of Cuba. The ship's company consisted of seven persons,— the master, two mates, and four seamen, including the cook and steward. After they sailed, nothing further was heard of the per-

---

1 [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

sons on board until the 2d of September following the time of their departure from Portland. On that day, in the open sea. on the Bahama Banks, Captain Chase Bryant, of the bark Black Squall, being on a voyage from Philadelphia to Havana, fell in with an open boat in which were three men. He took the boat and men on board his vessel, and continued on his way to Havana. The three men were Peter Williams, Abraham Cox, and Thomas Lahey. Cox and Williams told Captain Bryant that the rest of the ship's company were washed overboard in a squall, while the three survivors were below; that the vessel was.so much damaged as to be unmanageable; and that they three, collecting such things as they could from the ship, took to the boat to save their lives. In the boat were found a quantity of provisions and water, a compass and register belonging to the brig, one or two chests of clothing, proved to have been the property of the first and second mates, and a watch, proved to have belonged to the master. On the arrival of the Black Squall at Havana, the defendants and Lahey (who died before. the trial) were arrested by the American consul in consequence of information given by Captain Bryant. Cox and Williams were first separately examined upon oath before the consul, and their statements reduced to writing, when their stories were substantially the same as those which they told to Captain Bryant. Lahey was subsequently examined, and his statements implicated Cox and Williams, who thereupon, in the presence of several persons, confessed the murder of the missing members of the ship's company, and described in detail the manner and circumstances of the crime. Their confessions were also taken in writing by the consul, signed by the prisoners, and were offered in evidence, together with proof of the facts already recited.

On this state of facts. the district judge instructed the jury as follows:—"It is true that in our jurisprudence the accused cannot be convicted on their own confessions, without some corroborating proof of the corpus delicti. There must be some proof that the crime has been committed independent of the confessions, but it is not necessary that it should be plenary proof. There must be evidence tending or conducing to prove the fact; and if it has that tendency, it is proper to be submitted to a jury, and if not, it ought to be excluded as irrelevant." The jury returned a verdict of guilty against both the accused. A motion in arrest of judgment was filed. because it did not appear in and by the indictment upon which the prisoners were tried that said indictment was found by a grand jury duly drawn and impanelled. the inquest being therein described as "the jurors of the United States." New trial was also asked, on the ground that there was not, independent of the confessions, such proof of the corpus delicti as would warrant a conviction.

George Evans and T. H. Talbot, for defendants.

The indictment is bad, because it does not show on its face that it is found by a grand jury. The final authority upon this point is the constitutional provision. Const. U. S. Amend. art. 5. There is no intervening statute, and if there were the indictment must conform to the constitution. It has never been decided that an indictment in the present form answers the constitutional requirements. The usage in Maine and Massachusetts may lend its sanction to this indictment: but the usage, however old, cannot make it good. Its age is objectionable, and makes it out of date, being older than the constitution. Low's Case, 4 Greenl. 443. But the usage is not uniform. Thacher, Cr. Cas. 284. It is not enough that the court knows that the indictment has been found by a grand jury; the prisoner has a right to know. and his information must come, if at all, through the indictment. A confession is not admissible if given under oath. 1 Greenl. Ev. § 225; 1 Archb. Cr. Law, 411; 2 Russ. Crimes, 649; 2 Starkie, Ev. 36; 4 Hawk. P. C. bk. 2, c. 46, § 37. If the record offered shows that the confessions were given under oath, parol evidence cannot be introduced to contradict it. Reg. v. Wheeley, 8 Car. & P. 250. The record does show that the confessions were given under oath. The prisoners were first sworn to tell the truth about the loss of the Albion Cooper; and in their confessions there was no change of subject, and no purgation from the oath. The following are the English cases: Berwick's Case, Fost. Crown Law, 10; Francia's Case, 1 East, P. C. 133; Lambe's Case, 2 Leach, 552; Thomas' Case, Id. 637; Wheeling's Case, 1 Leach, 311, note; Rex v. Eldridge, Russ. & R. 440; Rex v. White, Id. 508; Rex v. Tippet, Id. 509; Rex v. Falkner, Id. 481; 1 Phil. Ev..535; 1 Archb. Cr. Law, 126. These do not support the rule in Badgley's Case, 16 Wend. 53. The American decisions agree with the text-books in laying down the rule of law, that in capital cases the corpus delicti cannot be proved by confessions, but must be proved, before the jury can convict, by independent testimony, by proof aliunde. In 1 Greenl. Ev. § 217, is to be found the full and accurate statement of the law upon this point. and his high authority is supported by other writers of unquestioned accuracy. Cowen & Hill's Notes of 1 Phil. Ev. 532; Whart. Cr. Law, § 683; 2 Russ. Crimes, 824, 825, note, and 826. The American cases are not numerous. 15 Wend. 147; 16 Wend. 63. The earlier of these, Hennessey's Case, is one in which the facts and results favor the motion of the prisoners. The verdict was set aside for want of evidence aliunde. In Badgley's Case the conviction was confirmed, and thus the two cases move in opposite directions. State v. Aaron, 1 South. [4 N. J. Law] 231; State v. Guild,

5 Halst. [10 N. J. Law] 163; Stringfellow's Case, 26 Miss. 157.

George F. Shepley, U. S. Dist. Atty.

It is not necessary that the word "grand" should precede the word "jurors" in the indictment. Whart. Prec. 14, note a. The court knows, from its record in the case, that the bill has been brought into the court by the grand jury, and that the signature of the foreman is that of the foreman of the grand jury. Com. v. Read, Thacher, Cr. Cas. 180. The words "the jurors for the said United States" as clearly show they were the grand jurors as in the English indictments the words "the jurors for our Lady the Queen." This is in accordance with the form invariably used in the federal courts in Maine and Massachusetts from the adoption of the federal constitution. U. S. v. Bird [Case No. 14,597]; U. S. v. Hobart (not reported). From the time of the finding of these indictments, the one the first capital case after the adoption of the constitution, the other the first in the federal courts in Maine after the separation, the practice has been uniform, and the same form of commencement in this respect has been observed in the federal courts as in the state courts in Maine and Massachusetts. Process Act, 4 Stat. 478. If there was any doubt upon the question whether the confessions were or not made under oath, the prisoners have had the benefit of that, for the court instructed the jury that if they believed the confessions to have been under oath, or if they believed even that the persons supposed themselves to have been under the influence of an oath, and that these confessions were induced by the influence of that belief, they should disregard them. The reason for excluding confessions is not that one is less likely to tell the truth under oath than not under oath, but it is that one under examination charged with crime is not bound to criminate himself. Consequently, if the examining magistrate puts him under oath when he is charged with crime, what he says while under oath is not deemed a voluntary statement. He is supposed to have been required to answer instead of having volunteered his statement.

There has been no invasion of the right of a person charged with crime not to be compelled to give evidence against himself. But at the same time, what a person has testified to under oath while being examined as a witness in favor of or against other parties, or before a grand jury, or before a coroner's inquest, before he was himself charged with crime, has been received. People v. McMahon, 2 Parker, Cr. R. 663–672; People v. Hendrickson, 1 Parker, Cr. R. 396; Wheater's Case, 2 Moody, Crown Cas. 45. In Rex v. Wilkinson, 8 Car. & P. 662, the confession of the prisoner was received, though not signed by himself or the magistrate who wrote it; and the statements read

to the jury. The general principle is, that a voluntary confession is one of the strongest proofs of guilt, and the highest species of evidence. 2 Starkie, Ev. 36; 1 Phil. Ev. (7th Ed.) 110, 111; 2 Russ. Crimes, c. 4, § 1, 824; Rosc. Cr. Ev. 37; Gilb. Ev. 137; 1 Greenl. Ev. § 215; Warickshall's Case, 1 Leach, 263. Hence the maxim, "Habemus optimum testem confitentem reum." Confessions are divided into two classes,—judicial and extrajudicial. 1 Greenl. Ev. p. 273, § 216. A judicial confession, voluntarily made and regularly proved, is sufficient, if the jury believe it, to convict the prisoner without any corroborating evidence. 2 Hawk. bk. 2, c. 46, § 29; 1 Phil. Ev. (4th Am. Ed.) 541; Starkie, Ev. pt. 4, 53; Guild's Case, 5 Halst. [10 N. J. Law] 186. An extra-judicial confession, not subject to any imputation of having been induced by the torture of fear, or the flattery of hope, furnishes sufficient ground for conviction when confirmed by corroborating circumstances. It is not necessary that such corroborating testimony should afford plenary proof of the corpus delicti. Greenleaf, while admitting the law in England to be as contended for, claims that a different rule obtains in the decisions of the courts of the United States, and that, before a conviction can be based upon a confession, there must be independent proof of the corpus delicti. 1 Greenl. Ev. § 217. The only cases referred to as sustaining this position are State v. Long, 1 Hayw. (N. C.) 455,—a per curiam opinion overruled in State v. Broughton, 7 Ired. 96, and Guild's Case, 5 Halst. [10 N. J. Law] 163, in which it is expressly decided that it is only necessary that the confession should be corroborated. 2 Hawk. c. 46, § 36, is also referred to. But, so far from sustaining the position laid down in 1 Greenl. § 217, both the thirty-sixth section and section thirty-ninth will be found to state a proposition diametrically the opposite. If by the word "proof" Greenleaf is to be understood as meaning "plenary proof," his statement is entirely unsupported on principle, or by any authority. The only explanation that can be made is, that the word "proof" was used by him to mean "evidence" merely. People v. Hennessey, 15 Wend. 147; People v. Badgley, 16 Wend. 53. Full proof of the body of the crime, the corpus delicti, independently of the confessions, is not required by any of the cases; and in many of them slight corroborating facts were held sufficient. People v. Badgley, 16 Wend. 59. The prisoners, and the prisoners only, know the fact of the death absolutely and with certainty. Shall they not be allowed to prove by their oft-repeated and voluntary and corroborated statements a fact against themselves, of which their evidence would have afforded plenary proof against any other person? and if so, upon what principle may they not admit against themselves, and against their interest, and the prompt-

ings of every motive, a fact which might have been proved by another person with no better knowledge of the facts, and with less of guaranty that his evidence was not distorted by interest, passion, or prejudice?

CLIFFORD, Circuit Justice. The indictment in this case was drawn upon the eighth section of the act of congress of the 30th of April, 1790 [1 Stat. 112], which provides, among other things, that if any person or persons shall commit upon the high seas, or in any river, haven, basin, or bay, out of the jurisdiction of any particular state, murder or robbery, or any other offence which, if committed within the body of a country, would by the laws of the United States be punishable with death, every such offender shall be deemed, taken, and adjudged to be a pirate and felon, and being thereof convicted shall suffer death. The charge is in effect that the prisoners, Peter Williams and Abraham Cox, on the 29th of August, 1857, piratically, feloniously, wilfully, and of their malice aforethought, assaulted and murdered one Quinton D. Smith, an American citizen, on board a certain vessel called the Albion Cooper, upon the high seas and out of the jurisdiction of any particular state, and within the admiralty and maritime jurisdiction of the United States, and within the jurisdiction of this court; and that the prisoners were apprehended and first brought into this district after committing the offence. After verdict and before judgment, the prisoners duly filed two motions for the consideration of the court, —one in arrest of judgment, and one for a new trial, upon the ground that improper evidence had been admitted against them, and also upon the ground that the jury had been misdirected in matters of law by the judge who presided at the trial. These motions were argued before this court at a special term held for that purpose on the 15th of March, 1858, and the questions arising under the motions were held under advisement. In stating the conclusions to which we have come, we will follow the order of the argument at the bar, and commence with the motion in arrest of judgment. The only cause assigned in the motion is, that "it does not appear in and by the indictment, upon which the prisoners were tried, that the same was found by a grand jury duly drawn and impanelled." A brief reference to the act of congress, of the 8th of August, 1846 [9 Stat. 72], and to the record in this case, will show that the persons who served as grand jurors, and who found the indictment, were regularly summoned, impanelled, and sworn. The third section of that act provides. that no grand jury shall hereafter be summoned to attend any circuit or district court of the United States, unless the judge of such district court or one of the judges of such circuit court shall in his own discretion, or upon a notification of the district attorney that such jury will be needed, order a venire to be issued

therefor, provided that nothing herein shall prevent either of said courts in term from directing a grand jury to be summoned and impanelled, whenever in its judgment it may be proper to do so, and at such time as it may direct. It appears by the record in this case, that the circuit court met according to adjournment on the 3d of October, 1857, when, on the written request of the district attorney of the United States for this district, it was ordered by the court that venires issue for the return of twenty-two grand jurors to attend at the United States court-room in Portland, in the district of Maine, at an adjourned session of said court, there to be holden at ten of the clock in the forenoon of Tuesday, the 3d of November, 1857, from the towns and cities, and in the proportions therein named. And the venires were accordingly issued on the same day; and the record further states, that the court met again on the 3d of November, 1857, pursuant to the last adjournment, when the venires were duly returned, and the persons drawn as grand jurors appeared and were duly impanelled and sworn, and the name of each grand juror, including that of the foreman who was duly appointed, was entered in the record of the case. These proceedings were regular in form, and they show beyond controversy that the jurors were summoned, impanelled, and sworn as a grand jury of the United States of America for the First circuit and district of Maine, and in strict compliance with every requirement of the law in such cases made and provided. Act of congress, July 20, 1840 [5 Stat. 394],—Rev. St. Me. c. 135, §§ 10-20. And it also appears from the record, that the same jury, on the 5th of November, 1857, came into court and returned the indictment under consideration, with three others, as true bills against the prisoners at the bar, and the indictments were received by the court and duly filed and entered of record. None of these proceedings are called in question by the counsel of the prisoners, and yet it is contended in their behalf that the indictment itself is defective, because the words used therein, as descriptive of the jurors by whom it was found, are not the same as those employed in the fifth article of the amendments to the federal constitution. That article provides that no person shall be held to answer for a capital or otherwise infamous crime (with certain excepted cases) unless on a presentment or indictment of a grand jury; and the argument proceeds upon the ground that the words, "the jurors of the United States of America," which are the words employed in the indictment, are not equivalent to the words "grand jury," as contained in that provision; and it is insisted that the judgment should be arrested on account of that defect in the indictment. No other exception is taken to the indictment, except that. the word "grand" is omitted before the word "jurors" at the commencement; and it is very properly admitted that the indictment is, in this par-

ticular, drawn in perfect accordance with the general practice and precedents in this district, and in all, save one, of the states included in the First circuit.

Nearly seventy years have elapsed since the judicial system of the United States was organized under the act of congress, passed on the 24th of September, 1789 [1 Stat. 73]; and throughout the entire period, since that time, the form of indictments in this district, so far as respects the particular in question, has been the same as the one adopted in this case. While Maine remained a part of Massachusetts, the district court had jurisdiction in all cases cognizable in a circuit court, except appeals and writs of error, and was authorized to proceed therein in the same manner as a circuit court; and as early as the first day of June, 1790, the records of that court furnish an example of an indictment for the crime of murder, in form like the one against the prisoners at the bar; and shortly after Maine was admitted as. a state, the records of this court furnish another example to the same effect; and in the case first named, the prisoner was convicted, sentenced, and executed. We have examined these indictments, and are satisfied they were drawn from the precedents in general use in the state composing the district. They are in substance and legal effect the same as the precedents in general use in England immediately prior to the separation of the colonies from the parent country; and in all formal particulars, including the one in question, they are in exact conformity to the most approved precedents of indictments, used in all the courts of the commonwealth of Massachusetts, when the judiciary act was passed. A formal indictment, in criminal cases, is as necessary in the federal courts as in the criminal jurisprudence of the states; and yet, when the federal system of the United States was organized, the form of indictments was not prescribed; and there is nothing contained in any act of congress, directly referring the matter to any standard, by which their precise requisites can be ascertained. That system was organized, as before remarked, under the act of 1789; and the eleventh section provides, among other things, that the circuit courts shall have exclusive cognizance of all crimes and offences cognizable under the authority of the United States, except where this act otherwise provides, or the laws of the United States shall otherwise direct, and concurrent jurisdiction with the district courts, of the crimes and offences cognizable therein; and it is provided by the twenty-ninth section, that in cases punishable with death, the trial shall be had in the county where the offence was committed, or where that cannot be done without great inconvenience, twelve petit jurors shall be summoned from thence. And the section then goes on to declare the manner in which juries shall be formed in the federal courts, and prescribes their qualifications; and we refer to those provisions as furnishing a clear and decisive indication as to the rule of decision, to which it was the intention of congress to refer all matters connected with the accusation and trial of offenders in the federal courts, not otherwise provided for in the constitution and laws of the United States. The forming of juries is expressly referred to the practice in the state where the trial is had, and to the laws of the state as they existed at the time when the judiciary act was passed; and, by necessary implication, the qualification of jurors was to be determined by the same rule. Some of the provisions of the act of 1790, called the crimes act, furnish further confirmation of the proposition, that all matters respecting the accusation and trial of offenders not otherwise provided for were referred to the usages and laws of the states. That act prescribes the punishment, annexed to all the principal crimes against the United States,. including treason, misprision of treason, murder, piracy, manslaughter, forgery, and perjury and subornation of perjury, and yet it is silent in regard to the form of indictments in every one of the crimes enumerated in the act, except the two last named; and the provision made in respect to them we think. deserves a particular examination. It is contained in sections nineteen and twenty. Section nineteen provides. in effect, that it shall be sufficient, in an indictment for wilful and corrupt perjury, to set forth the substance of the offence, and by what court or before whom the oath or affirmation was taken, together with the proper averment to falsify the matter wherein the perjury is assigned, without setting forth the bill, answer, information, indictment, declaration, or any part of any record or proceeding, either in law or equity, otherwise than as aforesaid, and without setting forth the commission or authority of the court or person before whom the perjury was committed; and the twentieth section contains a similar provision in regard to the rule of pleading in an indictment for subornation of perjury. These provisions were not the work of supererogation. On the contrary, they were obviously designed to subserve a useful purpose, and, beyond question, had the effect to modify some existing rule of decision, which would have continued to operate, if those provisions had not been enacted; and the inquiry is, What was that rule of decision which congress intended to modify by those enactments? It could not have been any rule previously established by an act of congress, as the national legislature had never before passed any act upon the subject; and certainly it could not have been the rule prevailing in England at that time, as her laws were then foreign laws, and of course they could have no effect in the federal courts; and still it is obvious that it was the purpose of the act to modify some

acknowledged and well-known rule upon the subject, so as to relieve the prosecutor from the strictness in pleading which had previously been required in respect to those offences; and as there is no other rule which congress could have had in view, we are led' to conclude it must have been the common law prevailing in the jurisprudence of the states, and, if so, it affords strong ground for presumption that it was the intention of congress to refer all the matters not otherwise provided for in respect to the accusation and trial of offenders to the same source for their solution. No other provision was made either in the act of 1789 or the crimes act of 1790, respecting the form of indictments, and none whatever in regard to the mode of conducting the trial after the jury are sworn, or the rules of evidence by which the guilt or innocence of persons accused of offences was to be ascertained or determined. Matters of such moment could not have been overlooked, for the reason that, without some regulation upon the subject, the system itself would have been imperfect and useless; and as there is no other standard by which they can be determined, it is clear that they must be referred to the laws of the states and the usages and customs of the courts at the time when the judicial system of the United States was organized. U. S. v. Reed, 12 How. [53 U. S.] 761. The motion in arrest of judgment is therefore overruled.

Several propositions are embraced in the motion for a new trial, which we will now proceed to examine in the order in which they were presented by the counsel of the prisoners. Before doing so, however, we desire very briefly to notice a preliminary question, whether this court, under the constitution and laws of the United States, possesses the power to grant a new trial in a capital case, as it would be useless to consider the merits of the motion, if there is no power conferred upon the court to grant it. It was held by Judge Story, in U. S. v. Gibert [Case No. 15,204], that a new trial could not be granted in a case very much like the present. That conclusion was based chiefly upon the ground that a second trial, though allowed at the request of the accused, would be a violation of that provision of the constitution which provides in effect that no person "shall be subject for the same offence to be twice put in jeopardy of life and limb." Judge Davis dissented at the time, and held that the prohibition was intended for the security and benefit of the accused, and as such, that it might be waived and relinquished; and such is now the settled doctrine in all the circuit courts of the United States, and in every state court where the subject has been considered. Since the date of that decision, the point has been discussed in twenty of the states of this Union, and in every instance it has been held that a new trial may be granted on the application of the accused. Many of the cases are collected in

People v. Morrison, 1 Parker, Cr. R. 625, to which we refer for a summary of the authorities upon the subject. They are also to be found in 2 Benn. & Heard Lead. Cr. Cas. 464, where the whole subject is very satisfactorily reviewed. New trials were unknown in the ancient common law, either in civil or criminal cases; and after the power of courts in this behalf was fully established in the time of Lord Mansfield, it was seldom and perhaps never exercised in criminal cases above the grade of misdemeanors. In later times, new trials are granted in England in felonies as well as in the lower offences, whenever the error is one which cannot be satisfactorily corrected in any other way. Reg. v. Scaife, 2 Denison & P. Crown Cas. 281.

Errors will sometimes occur in a jury trial, and there must be, as there always has been, some mode by which they can be corrected; and no reasoning can be satisfactory, whatever may be its basis, which would deprive courts of justice of the power to set aside a verdict at the request of one who had been illegally convicted; and accordingly, we hold that this court has the power to grant a new trial, after conviction, for good cause shown, both in misdemeanors and felonies.

The first cause assigned for a new trial is that the court permitted evidence to be given to the jury, against the objection of the prisoners, which was not by law admissible. That complaint has reference to certain statements, made and signed by the prisoners on the 9th and 10th of September, 1857, before Thomas Savage, acting vice-consul of the United States for the port of Havanna, and it is insisted that those statements were made when under oath, and, therefore, were not voluntarily made. Judge Ware sustained the doctrine contended for by the counsel of the prisoners, that confessions made under oath were not admissible, and the depositions were not introduced.

We have examined both the depositions and the statements subsequently prepared, and on the face of the papers, we think, it is clear that the latter were not made under oath, just as clear as it is that the former were so made.

On this point there can be no doubt, and yet it is insisted that the statements might have been made by the prisoners under the impression that they were speaking under oath, and if so, that they were not voluntarily made and ought not to have been received. That difficulty was suggested to the judge at the trial and was fully obviated by him in the instructions given to the jury. The jury were told that if the prisoners, when they made those statements, believed that they were speaking under oath, then the statements ought to be laid out of the case; and we think the instruction was sufficiently favorable to the prisoners, and furnishes to them no ground of complaint whatever. Whether confessions, when made un-

der oath, are or are not admissible, it is not necessary now to determine, as the ruling on this point was in favor of the prisoners, and, therefore, we forbear to say more upon the subject.

The second cause assigned in the motion for a new trial is, that there was not sufficient proof that the statements were ever read to the prisoners or either of them before they were signed. Whether those papers were or were not read to the prisoners was a question of fact for the jury, and must have been found in the affirmative; and their finding ought not to be disturbed, unless it was against the evidence or, at least, against the weight of the evidence in the case. Two witnesses, Savage and Bryant, testify positively that the statement of Williams, which was first offered, was read to him; and in respect to the other, it does not appear that any such objection was taken to it at the trial, and it is now said in argument for the United States that witnesses were present by whom the fact could have been proved, and were not called because the objection was not made.

Another answer to this ground of complaint arises from what does satisfactorily appear in the report of the case. Cox was present when Williams made his statement, and, as one of the witnesses says, "kept putting in a word," while the consul was reducing it to writing. That statement was read to Williams, and, of course, in the hearing of Cox, as he was present and must have been well understood by both; and as Cox's statement is substantially the same, and was only omitted till the following day for want of time to take it, we are unable to perceive any reason to doubt that it was understandingly made and signed. It bears his signature, and there is not a word of proof tending to show that it was unfairly obtained or that he did not fully understand its contents.

Another cause assigned in the motion for a new trial is that there was not sufficient legal evidence to authorize the jury to find that Quinton D. Smith had come to his death in any manner, and none to find that he had come to his death by violence; and the same questions are raised under a fourth proposition in various forms, alleging that the jury were misdirected by the presiding justice at the trial in matters of law.

Motions for a new trial in the federal courts are usually drawn up by the counsel of the party who is dissatisfied with the verdict, and in general are not required to be submitted either to the opposite counsel or to the court for revision until the hearing, and no serious inconvenience has resulted from the practice, as all such motions are addressed to the discretion of the court, and are made and filed subject to revision, and where they contain any errors in the recital of the facts or the instructions of the court, they are, as a matter of course, expected to be corrected.

There being no authentic report of the evidence, the facts of the case must be determined from the minutes of the judge who presided at the trial.

(At this point the court recapitulated the facts disclosed in the evidence and the confessions of the prisoners, and also quoted that part of the charge of the district judge applicable to these facts. The portion of the charge thus recited is given above.)

The counsel do not contend for the proposition that a conviction can in no case be had without a discovery of the body of the person alleged to be murdered, although there are some decided cases which at first reading seem to favor that view of the law; and such undoubtedly is the general rule in the law of felonious homicide, and it is one which ought always to be enforced whenever direct proof exists and it is practicable to obtain it. Lord Hale said he would never convict any person of murder or manslaughter, unless the fact was proved or the body found dead. Cases, however, have occurred, and it is greatly to be feared may hereafter occur, where the application of this rule would secure impunity to the murderer, and therefore would be unreasonable, as it would be in the highest degree prejudicial to the course of criminal justice. A murderer would only have to consume the body by fire, or decompose it by chemical means, or sink it in the depth of the sea, and the laws of society would be powerless to punish the offender.

That question was very satisfactorily considered by Judge Story, in U. S. v. Gibert [Case No. 15,204], where he said, when speaking of the application of that rule in a case very much like the case at bar, that "it certainly cannot be admitted as correct in point of common reason or of law, unless courts of justice are to establish a positive rule to screen persons from punishment who may be guilty of the most flagitious crimes. In cases of murder upon the high seas, the body is rarely if ever found, and a more complete encouragement and protection for the worst offences of this sort could not be invented than a rule of this strictness. It would amount to a universal condonation of all murders committed on the high seas."

It follows, therefore, that in cases where the discovery of the body after the crime is impossible, the fact of death may be proved by other means. Burrill, Circ. Ev. 679; Rex v. Hindmarsh, 2 Leach, 569; Best, Pres. 204, 205.

Many other cases might be cited to the same effect, but we deem it unnecessary, as the law appears to be well settled upon this point, and it is not controverted by the counsel of the prisoners. Assuming, then, that where it is impossible to discover the body, the fact of death may be proved by other means, the inquiry is, by what other means may that proof be made? Must it in all cases be direct proof, or may it be proved by strong and unequivocal circumstances which render

it morally certain and leave no reasonable doubt that such is the fact? Not a doubt is entertained by this court, that it may in the case supposed be proved in either of the modes suggested; that is, it may be proved by direct evidence, or where such does not exist, it may be proved by cogent circumstances, provided they are sufficient to produce conviction on the mind of the jury and to exclude every reasonable doubt. It must be so, else the laws for the punishment of felonious homicide are insufficient to reach the secret offender, provided he has the opportunity and employs the means to destroy the body.

We are not aware that the principles thus far advanced are denied in behalf of the prisoners; and yet it is insisted that "a confession is not sufficient to justify a conviction in capital cases, unless the corpus delicti be proved by independent evidence"; which in effect, as we understand the proposition, denies that it is admissible at all until the corpus delicti is first proved, and then only as it respects the agency of the accused. Confessions are never admissible unless they were freely and voluntarily made; and when so made they are in general regarded as strong proof of guilt, as it is not reasonable to suppose that a person really innocent would voluntarily subject himself to infamy and punishment. 2 Starkie, Ev. 36; 1 Phil. Ev. (10th Ed.) 110, 111.

"Confessions are received in evidence or rejected as inadmissible," said Eyre, C. B., "under a consideration, whether they are or are not entitled to credit. A full and voluntary confession is deserving of the highest credit, because it is presumed to flow from a strong sense of guilt, and therefore it is admitted as proof of the crime to which it refers; but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape, when it is to be considered as the evidence of guilt, that no credit ought to be given to it, and therefore it is rejected." Warickshall's Case, 1 Leach, 263. Confessions, in order to be of any weight, should be deliberately and understandingly made, and it ought also to appear that they are founded upon a full knowledge of the facts to which they relate. Suppose a seaman should confess that he drowned his captain by throwing him into the sea, and it should appear that it was done in the darkness of the night, and that other vessels were near, or that it was near the shore, all would agree that the confession should have but little or no weight to prove that death actually ensued, as the admission would not be founded on knowledge; and the testimony of a witness under the same circumstances and to the same facts would be entitled to no greater weight for the same reason; because neither the seaman who threw the man overboard, nor the witness who saw it, could know that death actually took place. That distinction was well taken in Rex v. Hindmarsh, 2 Leach, 569, and it is one which ought never to be overlooked in this species of evidence. In that case it appeared that while the ship was lying off the coast of Africa, where there were several other vessels, the prisoner was seen in the night to take the captain up in his arms and throw him into the sea, after which he was never seen or heard of; but that near the place on the deck where the captain was seen was found a billet of wood, and the deck and parts of the prisoner's dress were stained with blood. On these facts it was objected, that the corpus delicti was not proved, as the captain might have been taken up by some of the other vessels. But the court, while admitting the rule, left it to the jury to say, whether the deceased was killed before his body was cast into the sea; and the jury found in the affirmative, and the prisoner was convicted, and on a case reserved the conviction was approved by all the judges.

According to the statements of the prisoners in this case, Quinton D. Smith was dead before he was sewed up in old sails with weights and thrown overboard. His death is certain if the confession is true; whereas, in the case above supposed, everything confessed might be true, and yet the captain might have been alive. A careful attention to this distinction, and to the facts of each case, will explain what may otherwise seem to be an inconsistency in several of the authorities cited at the bar. The confessions in this case were free and voluntary, and are so comprehensive as to make it certain, if they are true, that death actually ensued, through violence inflicted by the prisoners, many hours before the body was thrown overboard; and having been made in respect to a case where the discovery of the body is impossible, and where the death, therefore, according to the well-settled rule of law, may be proved by other means, why are they not admissible, and, if admissible, who shall judge of the credit to which they are entitled except the jury? There can be but one answer to the question, when viewing it merely in the light of principle; and yet courts of justice in such cases are required to act with the greatest caution, and ought not to shut their eyes to the fact that a too ready credence of confessions has sometimes led to improper convictions; and in view of experience, perhaps it would be safer in every case, where there are no corroborative circumstances, to recommend an acquittal.

"Confessions," says Mr. Greenleaf, "are divided into two classes, namely, judicial and extra-judicial. Judicial confessions are those which are made before the magistrate or in court in the due course of legal proceedings, and it is essential that they be made of the free will of the party and with full and perfect knowledge of the nature and consequences of the confession. Of this kind are the preliminary examinations taken in writing by the magistrate pursuant to statutes, and the plea of guilty made in open court to an indict-

ment. Either of these is sufficient to found a conviction, even if to be followed by a sentence of death; they being deliberately made with the deepest solemnities, under the advice of counsel and the protecting caution and oversight of the court. * * * Extra-judicial confessions are those which are made by the party elsewhere than before a magistrate or in court, and they embrace not only explicit and express confessions of crime, but all those admissions of the accused from which guilt may be implied." All confessions of this kind, it is admitted by the learned author, are receivable in evidence, being proved like other facts, and are to be weighed by the jury: and where it appears that they were freely and voluntarily made in respect to facts within the knowledge of the accused, we have no doubt that the rule, as stated, is correct: and if so admissible, it is difficult to say that the jury are not the sole judges of the credit to which they are entitled. And yet it has been gravely questioned whether such confessions, when uncorroborated by any other proof of the corpus delicti, are of themselves sufficient to warrant a conviction in a capital case. Mr. Greenleaf strongly doubts their sufficiency, though he admits that they are receivable in evidence; and he adds emphatically, that in the United States a prisoner's confession, where the corpus delicti is not otherwise proved, has been held insufficient for his conviction; and in support of the proposition he refers to the following authorities. Guild's Case, 5 Halst. [10 N. J. Law] 163; Long's Case, 1 Hayw. (N. C.) 524; Hawk. P. C. bk. 2, c. 46, § 18. Considering the language employed by that author, it is somewhat doubtful how far he would carry the doctrine; and if it is to the extent that the corpus delicti must be fully proved independently of the confession, we are not prepared to adopt it, as in that view the admission of the confession would be useless, except to prove the agency of the accused, and would operate as an exclusion of the confession for any other purpose; whereas, if freely and voluntarily made, it is clearly admissible as evidence in support of any element in the charge to which it applies.

Full proof of the body of the crime, the corpus delicti, independently of the confession, is not required, says Nelson, C. J., in People v. Badgley, 16 Wend. 59, by any of the cases; and in many of them slight corroborating facts were held sufficient. The cases cited by Mr. Greenleaf do not assert a different doctrine; the one first cited distinctly affirms the same principle, and Long's Case, when carefully examined, is to the same effect. It merely asserts that naked confessions, unattended by circumstances, are not sufficient to warrant a conviction; but the court admit that where the circumstances related in the confession are proved to have already existed, that the confession may be evidence sufficient to authorize the jury to find the prisoner guilty. Hawkins says (book

2, c. 31, § 1), that an express confession is where a person directly confesses the crime with which he is charged, which is the highest conviction that can be, and may be received after the plea of not guilty recorded, notwithstanding the repugnancy. Russell says, that the highest authorities have now established that a confession, if duly made and satisfactorily proved, is sufficient alone to warrant a conviction, without any corroborating evidence. 2 Russ. (7th Ed.) 824. And it must be admitted that the cases cited in support of the text sustain the proposition. Wheeling's Case, 1 Leach, 311, note; Rex v. Eldridge, Russ. & R. 439; Rex v. Falkner, Id. 481.

While we admit that the cases cited appear to sustain the proposition, we still think that the proposition itself admits of essential qualifications, without which we should not be prepared to adopt it. A corpus delicti is always made up of two elements, in respect to which there is an important distinction, which should never be overlooked in an investigation of this kind. In felonious homicide they consist, first, of the fact of death; and, secondly, of other facts or circumstances showing the criminal agency of another: and in all cases the former constitutes the basis of the latter inquiry; and in general ought to be first proved. And even supposing that a free and voluntary confession may, under some circumstances, be sufficient, as where the body has been destroyed by fire, or consumed by chemical means, or sunk in the sea after life was extinct, yet it could only be so where the particulars given in the confession itself furnish the most satisfactory proof that the party confessing had full knowledge that death had actually taken place through his own acts. No such question arises in this case, and therefore we forbear to pursue the inquiry. Where the fact of death is fully proved by other evidence, no reason is perceived why the free and voluntary confession of the party, if deliberately made, may not be sufficient to establish the other element of the corpus delicti, provided it satisfactorily appears that other evidence does not exist.

The best proof of the corpus delicti, as well as the most effectual means of ascertaining its cause, is the finding and the inspection of the dead body, and a resort to other evidence, in respect to either element of which it is composed, ought never to be allowed except in cases where the discovery of the body is impossible. Where the body cannot be found, the fact of death may be proved by cogent and unequivocal circumstances, provided they are sufficient to establish the fact beyond every reasonable doubt. Whether, under any circumstances, a free and voluntary confession, deliberately made, would be sufficient without corroboration, it is not necessary now to decide, and therefore we forbear to express any decided opinion upon the subject, as no such question is raised in the instructions given to the jury, and none

such arises on the evidence reported by the judge who presided at the trial. Many facts and circumstances were proved at the trial. Independently of the confessions, tending to show that the crime had been committed; and some of the circumstances thus proved were of a character strongly to implicate the prisoners in the transaction. It was proved that the prisoners left Portland on the 7th of July, 1857, in the same vessel with Quinton D. Smith and the other men supposed to have been murdered, and that neither Smith, the other men, or the vessel have ever since been seen or heard from except through the confessions of the prisoners and of Lahey, who died before the trial. Neither the vessel nor the officers or men ever arrived at the port of destination or returned to the home port. At the time, or about the time, when the vessel should have arrived at Cardenas, the prisoners were picked up in a boat in the open sea, which boat was subsequently brought home and identified, and proved to be the only boat of the vessel in which they sailed. It was tarred inside in a manner to indicate that they had not left the vessel without preparation, and that fact was still more strongly indicated by the circumstance that they had in the boat the ship's compass, and a supply of water and provisions. They had in their possession also the watch of the captain, and the clothing of the murdered men, and all these articles were fully identified at the trial, as was the ship's register, which was also in their possession. After they were picked up, they gave contradictory and false accounts of what had occurred before they left the vessel, and persisted in the falsehood until Lahey disclosed the truth; and when they saw that detection was certain, they freely and voluntarily confessed their crimes. All these facts and circumstances were fully proved at the trial before the confessions were admitted, and we think they were of a character to be regarded as tending to prove, not only that the crime had been committed, but that it had been committed by the prisoners; and in that view of the case we are satisfied that the instructions given to the jury were correct. There is no decided case, either English or American, which asserts a contrary doctrine. It was supposed by the counsel at the argument that the Mississippi case constituted an exception, but we think it does not. The question there was, whether the extra-judicial confessions of a prisoner charged with a capital felony is sufficient without any proof whatever of the corpus delicti, independent of the confession; and it was held that the confession was not sufficient. Stringfellow v. State, 26 Miss. 169. See, also, State v. Cowan, 7 Ired. 239; State v. Aaron, 1 South. [4 N. J. Law] 231; People v. Hennessey, 15 Wend. 147; Burrill, Circ. Ev. 495; Best, Pres. § 257, p. 382. Other cases to the same effect might be cited; but these already referred to

we think are sufficient to show the state of the law in the United States, and it will be seen that they do not sustain the doctrine that the corpus delicti must be fully proved by evidence independent of the confession. It is doubtful whether Mr. Greenleaf intended to lay down any such rule, and if he did we are not prepared to adopt it, as it does not appear to have the sanction of any decided case either in England or the United States. All that can be required is, that there should be corroborative evidence tending to prove the facts embraced in the confession; and where such evidence is introduced, it belongs to the jury, under the instructions of the court, to determine upon its sufficiency.

The motion for a new trial, therefore, is overruled, and there must be judgment on the verdict.