## DAECHE v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. March 14, 1918.)

### No. 12.

1. CONSPIRACY ⊚⇒30—TO INJURE UNDERWRITERS—"CONSPIRACY TO DESTROY VESSEL WITH INTENT TO INJURE UNDERWRITERS."

Where it did not appear that defendants, who conspired by destroying with infernal machines ships carrying munitions to the Allies to raise insurance rates and thus aid Germany, intended only to attack insured vessels, the conspiracy does not fall within Cr. Code, § 296 (Act March 4, 1909, c. 321, 35 Stat. 1146 [Comp. St. 1916, § 10469]), denouncing "conspiracy to destroy any vessel with intention to injure the underwriters," for the object of defendant's conspiracy would be as effectually carried out if the danger was demonstrated upon uninsured vessels as if the vessels were insured.

2. CRIMINAL LAW ⊚⇒1177—HARMLESS ERROR—SENTENCE.

Where defendant was convicted under two indictments and sentenced under each verdict concurrently, the fact that the conviction under one indictment was erroneous cannot affect the sentence where it was warranted under the other indictment.

3. CRIMINAL LAW ⊚⇒114—LOCATION OF OFFENSE.

In a prosecution under Cr. Code, § 37 (Comp. St. 1916, § 10201), denouncing conspiracies to commit any offense against the United States, and section 298 (Comp. St. 1916, § 10471), denouncing the offense of attacking any vessel belonging to another with intent to unlawfully plunder the same or despoil any owner thereof of any goods, etc., where defendants to aid Germany conspired to attach to munition bearing ships while in the waters of the United States infernal machines which would explode while they were on the high seas, the offense must be deemed to have been committed within the United States, which was the place where the last conscious act of the wrongdoers was performed.

4. CONSPIRACY ⊚⇒30—TO "DESPOIL" OWNERS.

Under Cr. Code, § 298, declaring that whoever by surprise or by open force maliciously attacks or sets upon any vessel belonging to another with an intent to unlawfully plunder the same or despoil any owner thereof of any moneys, goods, or merchandise laden on board shall be punished, the word "despoil," in view of the use of the words "plunder" and "malicious," should be construed in the sense of divesting the owner of his possessions and not necessarily in the wrongdoer's acquiring the same,

and hence a conspiracy to destroy munition ships by means of infernal machines so as to aid Germany must be deemed a conspiracy to despoil the owners.

[Ed. Note.—For other definitions, see Words and Phrases, Despoil.]

5. CRIMINAL LAW ⬳535(2)—CONFESSIONS—CORROBORATION.

While some sort of corroboration of a confession is necessary to a conviction and that rule prevails in the federal courts, the corroborating circumstances need not be sufficient in themselves to establish the corpus delicti either beyond a reasonable doubt or by preponderance of proof.

6. CRIMINAL LAW ⬳534(1)—EVIDENCE—CONFESSIONS—CORROBORATION.

In a prosecution for conspiring to aid Germany by destroying ships bearing munitions to the Allies, evidence *held* sufficient to corroborate accused's confession.

7. CRIMINAL LAW ⬳781(3)—TRIAL—CORROBORATION—INSTRUCTION.

In a prosecution for conspiracy where the government relied on accused's confession and he admitted the truth of certain corroborating evidence, the giving of a charge that conspiracy might be proven by direct evidence, such as a confession or by circumstantial evidence together with a refusal of a requested charge that conviction could not be based on an uncorroborated confession, was not error.

In Error to the District Court of the United States for the Southern District of New York.

Paul Daeche was convicted under separate indictments under Criminal Code, § 37, of conspiracy to violate section 298, and of a violation of section 296, and he brings error. Affirmed on the first indictment, and reversed on the latter.

Writ of error to a judgment of conviction, entered on the 9th day of May, 1916, upon the verdict of a jury rendered on the previous day upon two indictments.

The first indictment alleged that the defendant, with certain others, to wit, Fay, Scholz, Bronkhorst, Breitung, and Kniezle, between the 1st day of June and the 21st day of October, 1915, entered into a conspiracy maliciously to attack and set upon certain vessels within the waters of the United States by surprise and open force, with intent unlawfully to depoil the owners thereof of certain shells, ammunition, and other munitions of war by contriving certain bombs to be secretly fastened to the sterns of the said vessels in such wise that they should explode and destroy them or so disable them as to render them unable to proceed to their respective destinations by which the owners of the munitions should be despoiled thereof. The indictment therein set forth various overt acts in pursuance of the conspiracy.

The second indictment alleged that the defendant and the same persons entered into a conspiracy to destroy vessels about to sail from the port of New York with intent to injure those persons who should have underwritten policies of insurance upon the same and upon their cargo, and that the said conspiracy was to be effectuated by use of the same bombs.

Upon the trial it appeared that the defendants Fay and Scholz had been engaged in a plan to prepare metal boxes to be filled with high explosives and attached to the sterns of ships which should leave the port of New York loaded with munitions for the Allies in the Great War. The bombs contained a mechanism by which, as the rudder of the ship moved from side to side, it would compress a spring. When the spring had been enough compressed, it would be released, and the release would explode the bomb, blowing off the stern of the ship, or at least doing great damage to the after part, and either rendering her helpless or sinking her. This scheme was frustrated by discovery of the police and all the defendants were arrested. At the time of their arrest and under circumstances which permitted the confessions to be used, they each confessed before the police officers their share in the plan.

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The defendant, whose confession alone is material here, said that he was a German, who had been here several years to learn a trade and was about to leave for his country at the outbreak of the war. Fay, who was an officer in the German army and had come over here to do what he could for the assistance of his country, told him that he had a plan by which he could blow off the stern of ships of the Allies carrying munitions to Europe. The chief purpose was to make the insurance rates higher. Fay told the defendant that for this purpose he needed a high explosive and deputed him to try to get the necessary dynamite, for this purpose giving him seventeen dollars. It was proved independently that the defendant had gone first to New Haven and afterwards to Bridgeport and there inquired of one Zinkernagel where he could obtain some explosives. Zinkernagel told him that he did not know where he could get any, that New York would be the best place. At the end of this interview the defendant sent a telegram to Scholz, one of the defendants, making an appointment with him in New York that night. Defendant went to New York and the next day appeared at the office of one Liebau. There he met Scholz, the defendant, and on Lauter. Meanwhile, Zinkernagel had sent to the defendant as he had promised, an article by one Vatterrodt upon the production of trinitrotoluol and on a subsequent interview at Liebau's the defendant asked Liebau for the address of Vatterrodt. There was other proof showing interviews between Scholz and Fay and the defendant, but aside from the foregoing there was substantially no corroboration outside of the confession. There was ample evidence, however, to justify the conclusion of the jury that Fay and Scholz were concerned in such a plan as was set forth in the indictment.

It was not shown that any of the ships to be blown up were in fact themselves insured, or that the defendants' purpose was other than to raise the insurance rates by generally increasing the danger to all shipping leaving the port of New York. The jury returned a verdict of guilty upon each indictment and the defendant was sentenced upon each verdict concurrently.

The points raised by the defendants on this writ of error were: That the proof did not support either indictment; second, that there was not sufficient corroboration of the defendant's confession to justify a case to the jury; and, third, that the court had committed error in its charge and in its refusal to charge. That part of the charge complained of was as follows: "It" (the conspiracy) "may be proved by direct evidence, such as the confessions of the defendant or by the proof of facts from which you can fairly infer the existence of the conspiracy which is called 'circumstantial evidence.'" The request refused was as follows: "I also except to your honor's charge where your honor said that the conspiracy may be proved by direct evidence, such as the confession of the defendant, and ask your honor to charge that if the proof of the conspiracy rests solely on the confession there can be no conviction unless there is independent evidence of the fact of the conspiracy outside of the confessions."

The first indictment was laid under section 37 of the Criminal Code, forbidding any conspiracy to commit any offense against the United States. The offense contemplated in this indictment was under section 298 of the Criminal Code, as follows:

"Whoever, upon the high seas or on any other waters within the admiralty and maritime jurisdiction of the United States, by surprise or by open force, maliciously attacks or sets upon any vessel belonging to another, with an intent unlawfully to plunder the same, or to despoil any owner thereof of any moneys, goods, or merchandise laden on board thereof, shall be fined not more than five thousand dollars and imprisoned not more than ten years."

The second indictment was laid under section 296 of the Criminal Code, as follows:

"Whoever, on the high seas, or within the United States, willfully and corruptly conspires, combines, and confederates with any other persons, such other person being either within or without the United States, to cast away or otherwise destroy any vessel, with intent to injure any person that may have underwritten or may thereafter underwrite any policy of insurance thereon or on goods on board thereof, or with intent to injure any person that he has lent or advanced, or may lend or advance, any money on such

vessel on bottomry or respondentia; or whoever, within the United States, builds, or fits out, or aids in building or fitting out, any vessel with intent that the same be cast away or destroyed, with the intent hereinbefore mentioned, shall be fined not more than ten thousand dollars and imprisoned not more than ten years."

Pratt, Koehler & Boyle, of New York City (Addison S. Pratt, of New York City, of counsel), for plaintiff in error.

Francis G. Caffey, U. S. Atty., John C. Knox, Asst. U. S. Atty., and Leo L. Leventritt, Sp. Asst. U. S. Atty., all of New York City.

Before WARD and HOUGH, Circuit Judges, and LEARNED HAND, District Judge.

LEARNED HAND, District Judge (after stating the facts as above). [1] We think that there was no case made out under the indictment for conspiracy to injure underwriters. Section 296 of the Criminal Code. The proof was of a purpose to raise the rates of insurance, a purpose not involving the existence of any insurance upon the vessels injured, and as well fulfilled if the increased dangers were made manifest upon those uninsured as upon those insured. Where the crime involves, as here, a specific intent, the existence of the intent must be proved as an independent fact, the state of mind prescribed in the statute. That state of mind is not proved by showing that the defendants had reason to suppose that the ships attacked might well be insured. Such knowledge would, it is true, be enough to charge them with the consequences of their acts, though the definition of the crime included those consequences, but it is not the equivalent of an intent to produce those consequences. Such an intent involves the belief that the consequences will in fact follow upon the acts. This the government made no attempt to prove.

[2] A verdict was taken on both indictments, and our conclusions as to that under section 296 need not, therefore, affect the sentence if the proof was sufficient upon the other. We think it was. The question is in two parts: First, whether the ship was to be attacked or set upon; second, of the specific intent. As respects the first point, the defendant correctly argues that a conspiracy to commit a crime over which the United States has no jurisdiction cannot itself be a crime against the United States under section 37, however it may have been at common law. He then says that the attack is where the ships were to be injured and that as the defendant's plan was to blow them up outside the league limit, and as they were not shown to be of United States register, the offense was to be committed outside the United States upon a foreign vessel. Over such a crime he concludes the United States has no jurisdiction.

[3] Now the section clearly does not require the spoliation of the owner, that is, the execution of the specific intent. Indeed, it may have been chiefly directed against attempted, but unsuccessful piracies. If a pirate in 1825, when the act was passed, had chased a ship and made active, but uniformly bad, practice with his bow chasers, there would be no doubt that he had attacked and set upon this ship, though he never broke her skin. Again if the defendant had fixed his bomb

to the stern-post of a ship, and the mechanism had failed to explode it, he would equally have attacked and set upon her. Or, if a knave were to open a ship's sea-cocks, expecting shortly to sink her, it would be an attack upon her though they were closed again and he were frustrated. In such cases the locus of the crime would necessarily be that of the last conscious act of the wrongdoer. Yet it cannot be different when the purpose is successful. In short, if the crime, as homicide, be defined to include some consequences of the act, it may be argued and has been generally decided (U. S. v. Davis, 2 Sumn. 482, Fed. Cas. No. 14,932; U. S. v. McGill, 4 Dall. 426, Fed. Cas. No. 15,676) that the crime takes place only where the consequences occur. The crime is the consequence when produced by human agency whether near or far. But where the crime covers only the conscious act of the wrongdoer, regardless of its consequences, the crime takes place only where he acts. We all have no doubt that this statute is of the second kind, and that the attack takes place where the wrongdoer performs the last conscious act in whose train in the course of things he expects the loss to follow.

[4] As concerns the specific intent, the case turns on the meaning of the word "despoil." We quite agree that its more common meaning involves the acquisition of possession by the wrongdoer. Yet it is a word with an ambiguous history and down to the second half of the eighteenth century was used in the sense merely of divesting the owner, as the definitions in the margin show.[1] In 1825, when this statute was passed, it had probably lost that use colloquially, but it was then and is now rather a word from the diction of poetry than "a word of art" from the formal terminology of law, defined by the gradual accretion of decisions. It remains what it always was, easily yielding its original significance to the suggestions of its context. In this section we take it rather as an alternative of "plunder" than its synonym. Such indeed is its grammatical relation, and, we think, such a construction follows from the fact that to "plunder" a vessel involves acquiring the property on board. That the two words overlap is true enough, but we see no reason to take them as coincident. Besides, we have perhaps the right to take into account the adverb, "malicious-

[1] The Oxford Dictionary gives five different uses of the word, with many subdivisions in each. The first use is: "To strip of possessions by violences, to plunder, rob." The second is: "To strip or deprive violently of, to rob." A quotation from Dr. Johnson's Letters is as follows: "You talk of despoiling his book of fine print."

The third use was (3b): "To undress; to strip of armour, vestments, etc.," but this is obsolete.

The fourth use, also obsolete, is: "To strip of worth, value or use; to render useless, mar, destroy."

A quotation in 1539 reads: "An action of trespass against * * * Robert Oliver for despoyling my grass."

Another, in 1685, was: "The besieged * * * again put in order the despoiled battery."

The Century Dictionary gives three uses, of which the second is: "To deprive by spoliation; strip by force, plunder; bereave; with of; as to despoil one of his goods or of honors."

The third use is: "To strip; divest, undress: used absolutely or with of (obsolete or archaic)."

ly," which in such connections more commonly connects a disposition towards the fruitless injury of another than towards gain. We all agree that it covers as well what would be malicious mischief on land, as larceny or embezzlement. The language of section 297 (Comp. St. 1916, § 10470), taken from the same act of 1825, and used in an analogous enactment, was "plunder, steal or destroy," and it is not an altogether remote possibility that "despoil" was used as an equivalent of "steal or destroy." In any event we feel that the word justifies us in attributing to it a meaning necessary to include a case that the statute could not possibly have intended to omit. General words, like all universals, indicate some posture of the will, and the fringes of their content are fairly determinable from their underlying purpose, at least till the edges have been clearly passed. We all think, therefore, that the crime was proved and it remains only to consider any errors which may have been committed at the trial.

[5] It must be conceded that there has been a very general concordance of judicial opinion in the United States that some sort of corroboration of a confession is necessary to conviction, and this concordance has extended to federal courts as well as elsewhere. U. S. v. Williams, 1 Cliff. 5, 28 Fed. Cas. No. 16,707; U. S. v. Boese (D. C.) 46 Fed. 917; U. S. v. Mayfield (C. C.) 59 Fed. 118; Flower v. U. S., 116 Fed. 241, 53 C. C. A. 271; Naftzger v. U. S., 200 Fed. 494, 118 C. C. A. 598; Rosenfeld v. U. S., 202 Fed. 469, 120 C. C. A. 599. That the rule has in fact any substantial necessity in justice, we are much disposed to doubt, and indeed it seems never to have become rooted in England. Wigmore, § 2070. But we should not feel at liberty to disregard a principle so commonly accepted, merely because it seems to us that such evils as it corrects could be much more flexibly treated by the judge at trial, and even though we should have the support of the Supreme Court of Massachusetts in an opposite opinion. Com. v. Killion, 194 Mass. 153, 80 N. E. 222, 10 Ann. Cas. 911. We start therefore, with the assumption that some corroboration is necessary, and the questions are to what extent must it go, and how shall the jury deal with it after it has been proved. The corroboration must touch the corpus delicti in the sense of the injury against whose occurrence the law is directed; in this case, an agreement to attack or set upon a vessel. Whether it must be enough to establish the fact independently and without the confession is not quite settled. Not only does this seem to have been supposed in some cases, but that the jury must be satisfied beyond a reasonable doubt of the corpus delicti without using the confessions, before they may consider the confessions at all. Gray v. Com., 101 Pa. 380, 47 Am. Rep. 733; State v. Laliyer, 4 Minn. 368 (Gil. 277); Lambright v. State, 34 Fla. 564, 16 South. 582; Pitts v. State, 43 Miss. 472. But such is not the more general rule, which we are free to follow, and under which any corroborating circumstances will serve which in the judge's opinion go to fortify the truth of the confession. Independently they need not establish the truth of the corpus delicti at all, neither beyond a reasonable doubt nor by a preponderance of proof. U. S. v. Williams, supra; Flower v. U. S., supra; People v. Badgley, 16 Wend. (N. Y.) 53; Peo-

ple v. Jaehne, 103 N. Y. 182, 199, 8 N. E. 374; Ryan v. State, 100 Ala. 94, 14 South. 868; People v. Jones, 123 Cal. 65, 55 Pac. 698.

[6] There was ample corroboration in this latter sense of the existence of an agreement to attack ships outside of Daeche's confession. He was in correspondence, personal and by letter, with Fay and Scholz at about the time in question. He was certainly trying to learn of the place where or the means whereby he could get high explosives, suitable to their plans. Taken alone they would not establish the conspiracy, but they give great probative strength to the confession, and indeed leave not the least doubt of his guilt.

[7] The last question, and the only one on which we are divided, touches the exception to the charge and the refusal to charge as requested. The defendant assumes that he was entitled to some instruction upon the question of corroboration. As we have already held that the corroboration need not establish the corpus delicti, at most the charge need only have been that the jury could not convict, if they disbelieved the corroboration altogether. The rule can in any event be no more than that a confession wholly uncorroborated will not serve; any quantitative measure of corroboration we mean to repudiate. Now substantially all of the corroboration the jury could not disbelieve, because the defendant, who took the stand, conceded that it was true. He swore that he had asked Zinkernagel for dynamite, that he had sent the telegram to Scholz and the letter to Fay, and that he had gone to Liebau's. The jury might have thought that the corroboration amounted to little, but they could not legally have disbelieved it. As a last clutch at a straw, it might be suggested that they might not have thought it corroborated, though true. We cannot, however, engage in such subtleties. The judge had allowed it in evidence, because it did tend to corroborate the confession, and upon that question of law we agree with him. Again, if the question were of the measure of corroboration, we should of course not assume to determine how much weight the jury might give it; but, as we have said, the question is whether there was any, not how much. The judge did right to refuse the charge, because it was not applicable to the conceded facts; nor was his charge wrong, unless it were interpreted as a direction to disregard conceded facts, an absurd interpretation to put upon it.

Judgment affirmed on the first indictment; reversed on the second.