## FORTE v. UNITED STATES.
### No. 6767.

United States Court of Appeals for the District of Columbia.

Decided April 5, 1937.

· J. William Tomlinson and James A. O'Shea, both of Washington, D. C., for appellant.

Leslie C. Garnett, U. S. Atty., and Roger Robb, Asst. U. S. Atty., both of Washington, D. C.

Before MARTIN, Chief Justice, and VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

STEPHENS, Associate Justice.

This is an appeal from a judgment of the District Court of the United States for the District of Columbia sentencing the appellant to imprisonment in a penitentiary. The case was tried to a jury. The appellant was charged with transporting a motor vehicle in interstate commerce, from the District of Columbia to Maryland, knowing it to have been stolen. The pertinent statute is the National Motor Vehicle Theft Act, 41 Stat. 324 (18 U.S.C.A. § 408). The text thereof is set forth in the margin.[1] At the close of the case for the

---

[1] *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the National Motor Vehicle Theft Act.

Sec. 2. That when used in this Act:

(a) The term "motor vehicle" shall include an automobile, automobile truck, automobile wagon, motor cycle, or any other self-propelled vehicle not designed for running on rails;

(b) The term "interstate or foreign commerce" as used in this Act shall include transportation from one State, Territory, or the District of Columbia, to another State, Territory, or the District of Columbia, or to a foreign country, or from a foreign country to any State, Territory, or the District of Columbia.

Sec. 3. That whoever shall transport or cause to be transported in interstate or foreign commerce a motor vehicle, knowing the same to have been stolen, shall be punished by a fine of not more than $5,000, or by imprisonment of not more than five years, or both.

Sec. 4. That whoever shall receive, conceal, store, barter, sell, or dispose of any motor vehicle, moving as, or which is a part of, or which constitutes interstate or foreign commerce, knowing the same to have been stolen, shall be punished by a fine of not more than $5,000, or by imprisonment of not more than five years, or both.

Sec. 5. That any person violating this Act may be punished in any district in or through which such motor vehicle has been transported or removed by such offender.

Government the appellant moved for a directed verdict in his own favor. During the argument of the motion, the United States Attorney advised the court that "the Government did not rely on the inference of guilt from possession of stolen property for a conviction in this case." The trial judge overruled the motion. The appellant excepted and advised the judge that he would stand on the Government's case, and requested the judge to instruct the jury to return a verdict of not guilty. This request the judge refused, and the appellant excepted. These rulings are assigned as error. The appellant contends that there was lacking, independent of his confession, substantial proof of the *corpus delicti* in that there was no evidence, independent of the confession, that he knew that the car was stolen. To the contrary the Government contends, apparently, that substantial proof of the whole of the *corpus delicti*, independent of the confession, is not as a matter of law requisite, and in any event that the *scienter* is not a part of the *corpus delicti*.

The evidence introduced for the Government was this: The car in question, a two seated Ford with District of Columbia tags, was stolen from in front of the residence of its owner in the District of Columbia on July 15, 1935. It was found by a police officer in the possession of the appellant in Baltimore on November 3, following. The appellant was driving it towards Washington; the officer apprehended him for speeding. When the car was thus discovered the rear seat and cushions had been removed, and the springs had been strengthened by adding leaves. The car smelled of alcohol. In it were gunny sacks and a robe. It bore New Jersey tags, and District of Columbia and Maryland tags were found under the front seat, but the District of Columbia tags did not belong to it; and the original District of Columbia tags were not on it. The appellant had a District of Columbia driver's permit, and a registration card issued to one Helen Kyle. The mileage of the car had increased since the date of the theft 6,500 miles. In a compartment in the back was $297 in cash. On his arrest the appellant said that this money had been given him in Washington to buy alcohol in Trenton, New Jersey, telling the arresting officer that the car and money were left at his home, which he said was in Washington, by one Monoi to make the trip. He said also on his arrest that he was coming from New Jersey. He told the arresting officer that he could have the money above mentioned if he would let him go. On the way back to Washington with another officer, the appellant admitted that he knew that the car he was using was a stolen car. To a third officer the appellant said that a man named Carroll brought the car to his house on Seventh Street in Washington and gave him money and the car to make the trip to New Jersey for alcohol. The appellant refused to tell where Carroll could be found, saying, "Never mind, I will take the rap for the car." The appellant told this third officer that the cushions for the car were at his house on Seventh Street, S. W., Washington, D. C. The officer found the appellant's mother there, but not the cushions. He never saw the appellant there. The cushions were returned to the owner of the car by the appellant's attorney.

There is some division in the authorities in respect of the rule of proof in cases involving confessions. A distinguished American text writer, Mr. John H. Wigmore, is of the view that there should be no definite rule forbidding conviction of an accused in a criminal case upon his uncorroborated confession. He points out in respect of the English law:

"The proposed rule appeared in two variations; by the one, the corroborative evidence might be of *any sort* whatever; by the other, it must specifically relate to the 'corpus delicti', *i. e.*, the fact of injury. The latter form tended to prevail; but in neither form did the rule obtain a general footing. So far as it can be supposed to obtain at all to-day in the English and Irish courts, it is apparently restricted to the case of homicide: . . ." [4 Wigmore, Evidence (2d Ed. 1923) § 2070, p. 406]

Further expressing his point of view as to the policy of such a rule, he states:

"The policy of any rule of the sort is questionable. No one doubts that the warning which it conveys is a proper one; but it is a warning which can be given with equal efficacy by counsel or (in a jurisdiction preserving the orthodox function of judges) by the judge in his charge on the facts. Common intelligence and caution, in the jurors' minds, will sufficiently appreciate it, without a laying on of the rod in the shape of a rule of law. Moreover, the danger which it is supposed to guard against is greatly exaggerated in common thought. That danger lies wholly in a

false confession of guilt. Such confessions, however, so far as handed down to us in the annals of our courts, have been exceedingly rare (*ante,* § 867). Such a rule might ordinarily, if not really needed, at least be merely superfluous. But this rule, and all such rules, are to-day constantly resorted to by unscrupulous counsel as mere verbal formulas with which to entrap the trial judge into an error of words in his charge to the jury. These capabilities of abuse make it a positive obstruction to the course of justice." [4 Wigmore, Evidence (2d Ed. 1923) § 2070, p. 406]

Mr. Wigmore concedes, however, that except in a few jurisdictions,[2] the courts in the United States have adopted a fixed rule that corroboration of a confession is necessary.[3] He believes them to have been "chiefly moved, in all probability, by Professor Greenleaf's suggestion that 'this opinion certainly best accords with the humanity of the criminal code and with the great degree of caution applied in receiving and weighing the evidence of confessions in other cases.'" 4 Wigmore, Evidence (2d Ed. 1923) § 2071, p. 407.[4] In respect of variations of the rule in the United States, Mr. Wigmore states that "in most jurisdictions the stricter form of rule is taken, and the evidence must concern the 'corpus delicti': . . ." 4 Wigmore, Evidence (2d Ed. 1923) § 2071, p. 408.

The conclusions reached by Mr. Wigmore on the one hand, and by Mr. Greenleaf and the greater number of the courts in the United States on the other, differ because they proceed from contrary premises. Mr. Wigmore's premise is that there is little danger of false confessions of guilt. He predicates this upon the proposition above quoted that "so far as handed down to us in the annals of our courts, [false confessions] have been exceedingly rare." To support this statement he comments that "No trustworthy figures of authenticated instances [of false confessions] exist; but they are concededly few." 2 Wigmore, Evidence (2d Ed. 1923) § 867, pp. 227–228. He then reviews in footnote a number of "the most notable in English and American annals" including Perry's Case, 14 How. St.Tr. 1312, 1660—where one of two brothers confessed that he, his brother and his mother had murdered his master, and they were executed, and two years later the master returned home explaining that he had been kidnapped and sold to the Turks. The premise of the reasoning of Mr. Greenleaf and the great majority of the courts in the United States is that there is real danger of false confessions, coerced or psychopathic. For this premise there seems now, whatever may have been the state of the data in 1923, the date of Mr. Wigmore's work, substantial foundation, not only in the annals of the courts in the sense of the reported decisions thereof, but also in dependable reports of criminological investigations. The comprehensive and detailed Report on Lawlessness in Law Enforcement of the National Commission on Law Observance and Enforcement (No. 11, June 25, 1931) concludes that the practice of forcing confessions is widespread throughout the country.[5] See also on this

---

[2] References to these are given in 4 Wigmore, Evidence (2d Ed.1923) § 2071, p. 407, note 1.

[3] References to these are given in 4 Wigmore, Evidence (2d Ed.1923) § 2071, p. 408, notes 3 and 4.

[4] The reference to Greenleaf is to Section 217, the full text of which as it appears in the 15th edition, Vol. 1, is:

"Whether *extrajudicial confessions uncorroborated* by any other proof of the *corpus delicti* are of themselves sufficient to found a conviction of the prisoner, has been gravely doubted. In the Roman law, such naked confessions amounted only to a *semiplena probatio,* upon which alone no judgment could be founded; and at most the party could only in proper cases be put to the torture. But if voluntarily made, in the presence of the injured party, or if reiterated at different times in his absence, and persisted in, they were received as plenary proof. In each of the English cases usually cited in favor of the sufficiency of this evidence, there was some corroborating circumstance. In the United States, the prisoner's confession, when the *corpus delicti* is not otherwise proved, has been held insufficient for his conviction; and this opinion certainly best accords with the humanity of the criminal code, and with the great degree of caution applied in receiving and weighing the evidence of confessions in other cases, and it seems countenanced by approved writers on this branch of the law."

[5] The Report reached the following "Conclusions as to the Existence of the Third Degree":

There are difficulties in forming conclusions as to the prevalence of the third

subject Leon R. Yankwich, "The Lawless Enforcement of the Law," (1935) 9 So. Calif.L.Rev. 14, and see Note (1930) 43 Harv.L.Rev.

We do not assume to say that third degree methods are practiced in this jurisdiction. Happily no such practice has reached the attention of this court since degree. Since the practice is illegal, there are bound to be professional denials of its existence from the police. On the other hand, the assertions of prisoners and their counsel are likely to be biased and exaggerated. The problem is one of police administration and therefore local. Conditions may differ in near-by localities, even in cities in the same State subject to the same laws. Conditions in a given locality may change with a change' of administration. (The only thorough-going investigation in any community would be one by persons clothed, as we were not, with the power by subpœna to compel the attendance of witnesses.)

But, after making all deductions for the inherent uncertainties of the subject matter, we regard the following propositions as established:

### I. Existence

The third degree—the inflicting of pain, physical or mental, to extract confessions or statements—is widespread throughout the country.

### II. Physical Brutality

Physical brutality is extensively practiced. The methods are various. They range from beating to harsher forms of torture. The commoner forms are beating with the fists or with some implement, especially the rubber hose, that inflicts pain but is not likely to leave permanent visible scars.

### III. Protracted Questioning

The method most commonly employed is protracted questioning. By this we mean questioning—at times by relays of questioners—so protracted that the prisoner's energies are spent and his powers of resistance overcome. At times such questioning is the only method used. At times the questioning is accompanied by blows or by throwing continuous straining light upon the face of the suspect. At times the suspect is kept standing for hours, or deprived of food or sleep, or his sleep is periodically interrupted to resume questioning.

### IV. Threats

Methods of intimidation adjusted to the age or mentality of the victim are frequently used alone or in combination with other practices. The threats are usually of bodily injury. They have gone to the extreme of procuring a confession at the point of a pistol or through fear of a mob.

### V. Illegal Detention

Prolonged illegal detention is a common practice. The law requires prompt production of a prisoner before a magistrate. In a large majority of the cities we have investigated this rule is constantly violated.

Through illegal detention, time is obtained for police investigation. Various devices are employed to extend this time, such as taking the prisoner to an outlying station, sometimes to another city, sometimes even to a neighboring State, misleading friends or counsel as to the place of detention and, in the meantime, shifting the prisoner to another place. In one large city the practice of shifting the prisoner from station to station has been so highly developed as to have, in local speech, a name of its own. But the practice is not confined to this city nor to the State in which it lies.

Though illegal detention is frequently a mere expedient to gain time for investigation, it may also be effective in "softening" the prisoner and making him more ready to confess. Especially is this so where, as in more than one city, many prisoners are jammed into the same cell, with the result that the air is vile, the sanitary facilities inadequate, the surroundings filthy and verminous, and sleep or rest next to impossible. Illegal detention is at times definitely used for purposes of compulsion—prisoners are told they will be detained until they confess.

The practice of holding persons *incommunicado*—unable to get in touch with their families, friends or counsel—is frequently encountered, so much so in certain places that there are cells called *"incommunicado cells."* [Report on Lawlessness in Law Enforcement, etc., Section IV, pp. 152–154]

The same Report of the National Commission, under the topic "Reported Cases in Appellate Courts," states:

"From 1920 to 1930, inclusive, there were 67 cases in which appellate courts found it to be proved that third-degree methods were used to extort confessions from suspected criminals. These cases came from the Fifth and Ninth United States Circuits and the Court of Appeals of the District of Columbia and from 26

240

Ziang Sung Wan v. United States, 266 U. S. 1, 45 S.Ct. 1, 69 L.Ed. 131 (reversing Ziang Sung Wan v. United States, 53 App. D.C. 250, 289 F. 908), and Perrygo v. United States, 55 App.D.C. 80, 2 F.(2d) 181. Happily also, according to the Report of the National Commission referred to, there is little evidence of the use of third degree methods by Federal officials anywhere [p. 155]. Moreover, there is no suggestion in the instant case that the statement of the appellant that he knew the car was stolen was not voluntary. But the case cannot be decided upon an *ad hoc* basis. The question presented is of first impression here; and we feel bound upon a subject touching so materially liberty, and in many cases life itself, and especially in the criminal law where justice requires equality of treatment in respect of trial procedure and proof, to give weight to the findings of the National Commission, and to follow in adopting a rule for this jurisdiction the rule of the great majority of the courts in the United States—that there can be no conviction of an accused in a criminal case upon an uncorroborated confession, and the further rule, represented by what we think is the weight of authority and the better view in the Federal courts, that such corroboration is not sufficient if it tends merely to support the confession, without also embracing substantial evidence of the *corpus delicti* and the whole thereof. We do not rule that such corroborating evidence must, independent of the confession, establish the *corpus delicti* beyond a reasonable doubt. It is sufficient, according to the authorities we follow, if, there being, independent of the confession, substantial evidence of the *corpus delicti* and the whole thereof, *this evidence and the confession are together convincing beyond a reason-*able doubt of the commission of the crime and of the defendant's connection therewith.

In support of the point of view we take we note the following: In Tingle v. United States (C.C.A.) 38 F.(2d) 573, the defendant, a warehouseman, was charged with conspiring with others to manufacture, sell and possess intoxicating liquor and property designed and intended for use in such manufacture. He signed statements that he had leased a portion of his warehouse for a brewery, and was aware of the purposes for which it was to be used. The court ruled:

"But in conspiracy cases, the unlawful combination, confederacy, and agreement between two or more persons, that is, the conspiracy itself, is the gist of the action, and is the corpus delicti charged. It is, therefore, primarily essential to establish the existence of a confederation or agreement between two or more persons before a conviction for conspiracy to commit an offense against the United States can be sustained. This statement requires no citation of authorities. It is equally true that 'extrajudicial confessions or admissions are not sufficient to authorize a conviction of crime, unless corroborated by independent evidence of the corpus delicti.' Martin v. United States (C.C.A.8) 264 F. 950. This has been the consistent holding of this court, in harmony with uniform decisions in other jurisdictions. Naftzger v. United States (C.C.A.) 200 F. 494; Goff v. United States (C.C.A.) 257 F. 294; Turinetti v. United States (C.C.A.) 2 F.(2d) 15. It is necessary, then, to determine whether there is in the record before us any substantial independent evidence of the corpus delicti, that is, the conspiracy charged, tending to

State courts—Alabama, Arkansas, California, Colorado, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, Nebraska, New York, Oklahoma, Oregon, Pennsylvania, South Carolina, Texas, Virginia, Washington, West Virginia, and Wisconsin.

"All the extracts and statements of fact in the text of this discussion are taken from these proved cases unless otherwise stated. In 39 additional cases there was evidence of the use of such practices although contradictory or doubtful. These additional cases come from some of the jurisdictions already mentioned and from six others—the Eighth United States Circuit and the States of Arizona, New Jersey, New Mexico, Ohio, and Utah. The whole list, therefore, comprises 106 cases from 31 States and 4 Federal circuits; every section except New England is represented.

"In England, by contrast, there has not been one reported case showing evidence of third-degree methods in the past 20 years." [pp. 52–53]

The Report cites and discusses the cases in appellate courts. There are included from the District of Columbia Ziang Sung Wan v. United States, 266 U.S. 1, 45 S.Ct. 1, 69 L.Ed. 131, and Perrygo v. United States, 55 App.D.C. 80, 2 F.(2d) 181.

corroborate the extrajudicial statements and admissions of appellant." [38 F.(2d) 573, at page 575]

Holding that the evidence in the case, outside the defendant's statement, was insufficient to satisfy the rule stated, the court reversed a conviction. In Jordan v. United States (C.C.A.) 60 F.(2d) 4, certiorari denied 287 U.S. 633, 53 S.Ct. 84, 77 L.Ed. 549, where the defendant was charged with perjury by making a false affidavit before a notary, it was objected that there was no direct evidence that he actually took the oath before the notary, and it was contended therefore "that the evidence does not satisfy the rule that in a criminal case the corpus delicti is not proved by an extrajudicial admission or confession of the defendant, but must be supported by independent evidence." But the notary's jurat itself had been introduced and it tended to show that the oath had been duly administered to the defendant in person as required by law. Recognizing the rule requiring evidence of the *corpus delicti* independent of the confession, the court said:

"The rule does not require that the independent evidence of corpus delicti shall be so full and complete as to establish unaided the commission of a crime. It is sufficient if the extrinsic circumstances, taken in connection with the defendant's admission, satisfy the jury of the defendant's guilt beyond a reasonable doubt. Bolland v. United States (C.C.A.) 238 F. 529, 530; Daeche v. United States (C.C.A.) 250 F. 566; Berryman v. United States (C.C.A.) 259 F. 208; Rosenfeld v. United States (C.C.A.) 202 F. 469; Mangum v. United States (C.C.A.) 289 F. 213." [60 F.(2d) 4, at page 5]

In Mangum v. United States (C.C.A.) 289 F. 213, involving a count of assault to commit rape and a count for rape, there was a confession, and it was contended that it was not supported by independent evidence of the *corpus delicti*. Recognizing that there must be evidence of the *corpus delicti* independent of the confession the court said:

"Evidence aliunde, however, as to the corpus delicti, need not be such as to alone establish the fact beyond a reasonable doubt. It is sufficient if, when considered in connection with the confession, it satisfies the jury beyond a reasonable doubt that the offense was in fact committed, and the plaintiff in error committed it. State

v. Rogoway, 45 Or. 601, 78 P. 987, 81 P. 234 [2 Ann.Cas. 431]; Flower v. U. S., 116 F. 241, 53 C.C.A. 271; Rosenfeld v. U. S., 202 F. 469, 120 C.C.A. 599." [289 F. at 216]

In Flower v. United States (C.C.A.) 116 F. 241, involving a charge of embezzlement and a confession, there was again raised the question of the sufficiency of the proof of the *corpus delicti*. The court there quoted, as a correct statement of the law, 6 Am. & Eng.Enc.Law (2d Ed.) p. 582:

"A conviction cannot be had on the extrajudicial confession of the defendant, unless corroborated by proof aliunde of the corpus delicti. Full, direct, and positive evidence, however, of the corpus delicti, is not indispensable. A confession will be sufficient if there be such extrinsic corroborative circumstances as will, when taken in connection with the confession, establish the prisoner's guilt in the minds of the jury beyond a reasonable doubt." [116 F. 241, at page 247]

See also United States v. Boese (D.C.) 46 F. 917. Probably the most frequently quoted, and we think at times misquoted, case on the subject of corroboration of confessions is Daeche v. United States (C.C.A.) 250 F. 566, where the court spoke through Learned Hand, then District Judge. There the indictment was for a conspiracy maliciously to attack vessels in United States waters, with intent to despoil the owners of munitions, by attaching bombs to the sterns of the vessels in such wise that they would explode and destroy the vessels or disable them. The defendant confessed his part in the plan, and the question whether or not there was sufficient evidence of the *corpus delicti*—the agreement to attack the ships—independent of the confession, was raised. Judge Hand expressed his personal agreement with the point of view of Mr. Wigmore discussed *supra*, but said that he nevertheless felt obliged to recognize the rule as contrary. He stated:

"It must be conceded that there has been a very general concordance of judicial opinion in the United States that some sort of corroboration of a confession is necessary to conviction, and this concordance has extended to federal courts as well as elsewhere. U. S. v. Williams, 1 Cliff. 5, 28 Fed.Cas. [636] No. 16707; U. S. v. Boese (D.C.) 46 F. 917; U. S. v. Mayfield (C.C.) 59 F. 118; Flower v. U. S., 116 F. 241, 53

C.C.A. 271; Naftzger v. U. S., 200 F. 494, 118 C.C.A. 598; Rosenfeld v. U. S., 202 F. 469, 120 C.C.A. 599. That the rule has in fact any substantial necessity in justice we are much disposed to doubt, and indeed it seems never to have become rooted in England. Wigmore, § 2070. But we should not feel at liberty to disregard a principle so commonly accepted, merely because it seems to us that such evils as it corrects could be much more flexibly treated by the judge at trial, and even though we should have the support of the Supreme Court of Massachusetts in an opposite opinion. Com. v. Killion, 194 Mass. 153, 80 N.E. 222, 10 Ann.Cas. 911. We start therefore, with the assumption that some corroboration is necessary, and the questions are to what extent must it go, and how shall the jury deal with it after it has been proved. The corroboration must touch the corpus delicti in the sense of the injury against whose occurrence the law is directed; in this case, an agreement to attack or set upon a vessel. Whether it must be enough to establish the fact independently and without the confession is not quite settled. Not only does this seem to have been supposed in some cases, but that the jury must be satisfied beyond a reasonable doubt of the corpus delicti without using the confessions, before they may consider the confessions at all. Gray v. Com., 101 Pa. 380, 47 Am.Rep. 733; State v. Laliyer, 4 Minn. 368 (Gil. 277); Lambright v. State, 34 Fla. 564, 16 So. 582; Pitts v. State, 43 Miss. 472. But such is not the more general rule, which we are free to follow, and under which any corroborating circumstances will serve which in the judge's opinion go to fortify the truth of the confession. Independently they need not establish the truth of the corpus delicti at all, neither beyond a reasonable doubt nor by a preponderance of proof. U. S. v. Williams, supra; Flower v. U. S., supra; People v. Badgley, 16 Wend.(N.Y.) 53; People v. Jaehne, 103 N.Y. 182, 199, 8 N. E. 374; Ryan v. State, 100 Ala. 94, 14 So. 868; People v. Jones, 123 Cal. 65, 55 P. 698." [250 F. 566, at pages 571, 572]

There are cases apparently contrary. Pearlman v. United States (C.C.A.) 10 F. (2d) 460, involved the same statute as does the instant case. The question there was "whether the proofs 'of the government measure up to the rule that there must be testimony tending to prove the corpus delicti independent of any confession of defendant." Notwithstanding this implied recognition of the rule in terms of the statement of the question, the court found the law to be as expressed in a partial quotation of the remarks of Judge Learned Hand above. The Pearlman opinion states: "We find the general rule to be as stated by Judge Learned Hand, in . . . Daeche v. United States . . . :

" 'Any corroborating circumstances will serve which in the judge's opinion go to fortify the truth of the confession. Independently they need not establish the truth of the corpus delicti at all, neither beyond a reasonable doubt nor by a preponderance of proof' . . ." [10 F.(2d) 460, at page 462]

That partial quotation from Judge Hand might well seem to indicate that the corroborating evidence need not touch the *corpus delicti*. But that sentence alone, we think, does not reflect the true meaning of Judge Hand's opinion. In Forlini v. United States (C.C.A.) 12 F.(2d) 631, 634, in an opinion by Manton, Circuit Judge, in which Judge Hand concurred, Daeche v. United States is referred to in a manner which, in our view, makes clear that it was intended to hold therein that in addition to a confession there must be "some independent proof of the corpus delicti." [6] The opinion in Pearlman v. United States is further confused by including the quotation set out *supra* from Mangum v. United States, which clearly requires some evidence of the *corpus delicti aliunde* the confession. On the evidence in the Pearlman Case, which was slight indeed, independent of the confession, so far as the *corpus delicti* was concerned, the case may be said to hold that the evidence, independent of a confession, need not touch the *corpus delicti* at all. But if the case so holds, we are unwilling to follow it. In Wynkoop v. United States (C.C.A.) 22 F.(2d) 799, where the defendant, a prohibition agent, was indicted for converting to his own use liquor of which he had come into possession officially, and where there were admissions by the defendant, the court, partially quoting as did the court in the Pearl-

---

[6] Mr. Wigmore classifies Daeche v. United States with the cases reflecting "the stricter form of rule. . . ." [4] Wigmore, Evidence (2d Ed.1923) § 2071, p. 408, note 4.

man Case, Judge Hand's opinion in Daeche v. United States, apparently intended to rule that any corroborating circumstances which fortify the truth of a confession will suffice for conviction, even if they do not, independently, touch the *corpus delicti*. But again we think this decision does not correctly reflect the views of Judge Hand in the Daeche Case, and we cannot follow it. In Bolland v. United States (C.C.A.) 238 F. 529, where the defendant was charged with knowingly receiving in pledge from a soldier property of the United States, and there was a confession, and a contention that the *corpus delicti* had not been established by evidence independent of the confession, the court apparently intended to rule that "All that can be required is that there should be corroborative evidence tending to prove the facts embraced in the confession; . . ." This was quoted from the opinion of the court in United States v. Williams, 1 Cliff. 5, 27, 28, Fed. Cas.No.16,707. That case is frequently cited, and is classified by Mr. Wigmore as supporting the proposition that 'the corroborating evidence need not touch the *corpus delicti*. In that case the facts were that the brig Albion Coop with a crew of seven sailed from Portland, Maine, on July 7, 1857, on a voyage to Cuba. Nothing was heard of those on board until September 2 following, when the bark Black Squall came upon an open small boat containing four of the crew, three of whom became the defendants in the case—the fourth dying before trial. In the small boat there were water, a quantity of provisions, the compass and register of the brig, clothing of the first and second mates, and the master's watch. The defendants first stated that the missing members of the crew, the captain and the two mates, had been washed overboard in a squall while the defendants were below, and that the brig being injured and unmanageable, the defendants and the fourth member took to the small boat to save their lives. But the defendants ultimately confessed that they had murdered the rest of the crew, and told in detail the manner and circumstances of the alleged crime. They were indicted for the murder of Quinton D. Smith. According to their confession they killed him, sewed his body in a sail with weights, and threw him overboard. The following was held sufficient corroboration of the confession: that Smith and the defendants sailed in the same vessel; that Smith had not been heard of since; that neither vessel nor Smith nor the other missing members of the crew ever arrived at destination or returned to the home port; that the small boat in which the defendants were found was the only one which the brig had; that the small boat carried water, compass and provisions—indicating preparation to leave the brig; the personal articles of the three missing members of the crew found in the small boat; the conflicting stories originally told by the defendants. Sustaining conviction of the defendants, the court said that of the two elements of the *corpus delicti*, the fact of death, and the criminal means thereof, only the first need be fully proved independent of the confession, that the confession might establish the second element provided it satisfactorily appeared that other evidence thereof did not exist. We think that this case, decided in 1858, does not represent the current rule upon the subject.

◼ In the instant case the *corpus delicti* is transportation of the vehicle in interstate commerce from the District of Columbia to Maryland knowing that it was stolen. The contention of the Government that the *scienter* is not a necessary element of the *corpus delicti* cannot be sustained. There is nothing criminal under the statute about transporting a vehicle across a state line unless the person transporting it knows it to be stolen. The law is well settled that the *corpus delicti* includes not only the body or fact of the wrong, in the sense of the death in homicide or the loss of the chattel in larceny, but also the criminal means by which the same came about. See 4 Wigmore, Evidence (2d Ed. 1923) § 2072, where the learned author, first expressing the personal view that the term *corpus delicti* ought to be taken to include only the first element, the fact of the injury or loss, and not the second, the criminality which is the source of the loss, nevertheless concedes that "by most judges the term is made to include the second element also." Mr. Wigmore cites among other authorities Commonwealth v. Webster, Bemis' Rep.(Mass.) 473, where Shaw, C. J., said: "In a charge of criminal homicide, it is necessary in the first place by full and substantial evidence to establish what is technically called the 'corpus delicti',—the actual offense committed; that is, that the person alleged to be dead is in fact so; that he came to his death by violence and under

such circumstances as to exclude the supposition of a death by accident or suicide and warranting the conclusion that such death was inflicted by a human agent; leaving the question who that guilty agent is to after consideration."

The *corpus delicti* does not properly include, as a third element, the agency of the accused as the criminal. This would make the term synonymous with the whole of the charge, and such a definition has been repudiated. See 4 Wigmore, Evidence (2d Ed. 1923) § 2072 (3), and therein cited Messel v. State, 176 Ind. 214, 95 N.E. 565 (rape under age), and State v. Schyhart (Mo.Sup.) 199 S.W. 205 (killing cattle). It would require, in view of the corroboration rule, that the whole of the charge, including the criminal agency of the accused, be evidenced independently of the confession. It is to be noted, however, that in certain types of crimes involving *scienter* on the part of the accused it is not possible to separate, either conceptually or practically—that is in respect of the proof—the *scienter*, as an element of the *corpus delicti*, and the agency of the accused. So in the crime of receiving stolen goods knowing them to be stolen, and in the crime at bar, it is not possible to separate, either conceptually or practically, the element of guilty knowledge in the transportation and the element of agency of the accused as the criminal. But this cannot operate to diminish the duty of the Government to present evidence of both elements of the *corpus delicti* independent of the confession.

Under the rules which we have laid down above we are unable to find warrant in the evidence presented in the instant case for denial of the motion for a directed verdict and refusal of the requested instruction of a verdict of not guilty. As stated above "the Government did not rely on the inference of guilt from possession of stolen property for a conviction in this case." Why the Government made this waiver does not appear—conceivably because of Kasle v. United States (C.C.A.)

233 F. 878, 888–890. But with this inference out of the case we see no substantial evidence, independent of the appellant's confession, of guilty knowledge on his part.[7] His offering the $297 to the officer if he would let him go is but a suspicious circumstance. It points to possible guilt of some offense, but not of any particular offense. The evidence that the original District of Columbia tags were not on the car and that there were District of Columbia tags in it but not belonging to it, and Maryland tags also in it, and New Jersey tags on it, are again suspicious circumstances pointing conceivably to some guilty use of the car; but they do not point to knowledge on the part of the appellant that it was stolen.

In accordance with the foregoing the judgment of the trial court is

Reversed.

---

[7] We do not rule upon the question whether there is such an inference, nor do we rule upon the question whether, if there is such an inference, it is within the power of the Government to waive it. No such questions were raised or ruled on below or raised here, and we therefore will not pass upon them here, especially as the defendant had a right to conclude at the trial that such an inference, if any there is, was out of this case. Had he had reason to conclude otherwise, he might well have wished to submit evidence on his own part.