## DENNY v. UNITED STATES.
### Nos. 5400, 5401.

Circuit Court of Appeals, Fourth Circuit.
Nov. 5, 1945.

Isaac Lobe Straus and Eugene O'Dunne, both of Baltimore, Md. (Hamilton O'Dunne and Bernard M. Goldstein, both of Baltimore, Md., on the brief), for appellant.

Bernard J. Flynn, U. S. Atty., of Baltimore, Md., for appellee.

Before SOPER, DOBIE, and NORTH-COTT, Circuit Judges.

SOPER, Circuit Judge.

William B. Denny, defendant in the District Court, was convicted in two cases that were tried together, one for conspiring to evade military service under the provisions of the Selective Training and Service Act of 1940, § 11, 50 U.S.C.A. Appendix, § 311, and the other for making false statements as to fitness for service under that Act. He was sentenced to serve two years in the first case and five years in the second, the sentences to run concurrently. This appeal questions (1) the sufficiency of the indictments; (2) the sufficiency of the .evidence; and (3) the admissibility of a confession wherein the defendant said that he had paid one Ches-

ter T. Ruby $250 to secure for him a 4-F classification.

We consider first the sufficiency of the indictments. The conspiracy indictment charged in substance that Ruby and Denny did feloniously combine, conspire, confederate and agree together to cause the evasion by Denny of service in the land and naval forces under the provisions of the statute, and that in pursuance of the conspiracy, the defendants committed certain overt acts among which it was charged that Ruby met Denny at a certain parking lot in Baltimore, Maryland and instructed him "as to statements he should make to the examining psychiatrists at the time he reported for his physical examination at the Induction Center, to-wit, he was to state that he was a high school graduate, in order to avoid taking the mental qualifications test; to exaggerate his nervous condition; to state that he did not want to be with people."

This indictment is said to be defective because it fails either to allege generally that Denny was subject to the provisions of the Act or to state specifically that he was a male person between the ages of eighteen and forty-five, and therefore liable for training and services in the armed forces of the United States under the terms of the statute. 50 U.S.C.A.Appendix, § 303. It is contended that this omission is a fatal defect in that it leaves out of the indictment one of the essential ingredients of the crime, since it does not appear with certainty whether or not the defendant belonged to the group of persons subject to the requirements of the statute. Moreover, it is contended that the charge is fatally vague and ambiguous because it does not specify whether the evasion contemplated by the conspirators was to be accomplished by making a false registration or making false statements in regard to the fitness of the defendant for service. For these reasons it is urged that the demurrer to the indictment should have been sustained in conformity with the ruling made in such cases as Ruthenberg v. United States, 245 U.S. 480, 38 S.Ct. 168, 62 L.Ed. 414; Keegan v. United States, 65 S.Ct. 1203; United States v. Blakeman, D.C.N.D.N.Y., 251 F. 306; Caldwell v. United States, 5 Cir., 139 F.2d 121.

We are of opinion that the indictment was sufficient in that it apprised the defendant of all that he needed to

know for his defense, and was sufficiently specific so that he was in no danger of being put a second time in jeopardy. If these essentials are met, a criminal pleading is sufficient. The great technicality that formerly prevailed in this branch of the law has been relaxed and the federal courts now generally hold that the sufficiency of criminal pleadings is to be determined on the basis of practical rather than technical considerations. Hagner v. United States, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861; United States v. Polakoff, 2 Cir., 112 F.2d 888, 134 A.L.R. 607; Phipps v. United States, 4 Cir., 251 F. 879; Martin v. United States, 4 Cir., 299 F. 287; Nye v. United States, 4 Cir., 137 F.2d 73. As pointed out in these and other cases, courts are admonished by the Acts of Congress relating to criminal procedure, 18 U.S.C.A. § 556, that no indictment presented by a grand jury in any court of the United States shall be deemed insufficient by reason of any defect or imperfection in matter of form only, which shall not tend to the prejudice of the defendant. This rule was applied in a situation similar to that in the pending case in Hopper v. United States, 9 Cir., 142 F.2d 167, 169, wherein the indictment in a case under the Selective Training and Service Act was charged to be defective, in that it failed to expressly state that the defendant belonged to the limited class of persons subject to selective service; but on rehearing, 142 F.2d 181, the indictment was held to be good. We do not mean to give our approval to a form of indictment which omits a pertinent allegation so easily made as that omitted in the pending case, especially as it serves to provoke unnecessarily the sort of technical objection now under consideration; but it is obvious that the defendant has suffered no prejudice by the failure to state a fact so well known to him as his own age, or his amenability to the provisions of the statute. If he were in need of more specific details, he could have applied for a bill of particulars. For these reasons we hold the conspiracy indictment to be sufficient.

■ The second indictment charged in substance that Denny, being a person duly registered and classified under and in accordance with the provisions of the Selective Training and Service Act of 1940 as amended, 50 U.S.C.A.Appendix, § 301 et seq., and the rules, regulations and directions made pursuant thereto, did knowingly, wilfully, unlawfully and feloniously make false statements as to his fitness for service under the provisions of the Act to officials of the Induction Center in that he falsely stated to said officials that he was a high school graduate in order to avoid taking the mental qualifications test. The indictment also contained the concluding clause that the defendant gave other false information which was intended to cause his rejection for service in the land and naval forces of the United States. This last clause is obviously so vague that it gave the defendant no information as to the specific charge he was to meet, added nothing to the allegations previously set out and may be rejected as surplusage. The defendant, however, contends that the charge contained in the prior allegations of the indictment was too broad and ambiguous in that it did not allege that the false statement attributed to him related to fitness for service, but merely showed his purpose or motive in making the statement. We regard this objection as hypercritical, for it seems to us that the indictment clearly shows that the false statement alleged related to and bore upon the defendant's fitness for service, and that he must have so understood it. We therefore hold that the second indictment was valid.

■ The objection of the defendant to the sufficiency of the evidence in support of the two charges rests in the main upon three grounds. First, it is said that the evidence was insufficient to show that the defendant had stated in the course of his examination at the induction station that he was a high school graduate. The defendant testified that when he was asked during the examination how far he had gone in school he answered "as far as high school", and the contention is that this is the only definite evidence on the point. The evidence, however, includes a printed form on which certain mental and physical characteristics of the defendant were noted by the examining officers during the course of the examination. This sheet bore the initials "H S" and the testimony tended to show that they were written by a yeoman stationed at the Armory whose duty it was to inquire of each of the inductees as to his educational qualifications and who made it a practice to insert the initials "H S" when the inductee stated that he was a graduate of a high school. The testimony of the government also showed, as will hereafter appear, that Ruby instructed the defendant to state that he was a high

school graduate when questioned during his examination. It is obvious that the evidence in regard to the defendant's false statement in question was substantial and sufficient to go to the jury.

Second, the defendant contends that the government failed to prove the second essential element of the substantive crime, to-wit, that the false statement related to the defendant's fitness for service in the land or naval forces. This defense is based upon the testimony of one of the examining psychiatrists who testified that he did not take the false statement into consideration in determining the mental condition of Denny and also upon the testimony of Ruby that graduation from high school was not a cause for the inductee's rejection. It is obvious, nevertheless, that the defendant's answer as to his educational history did bear upon his fitness for military or naval service. Each inductee was examined with reference to his educational qualifications and it needs no argument to show that they had a direct bearing upon his fitness for service in the armed forces. Moreover, further testimony of Ruby indicates the particular bearing of the false statement of the defendant in the pending case and its relation to the conspiracy and the purpose of the defendant to evade service. Ruby testified that the purpose of the false statement was to get the defendant out of the station as soon as possible so as to avoid a mental examination which otherwise might consume thirty to fifty minutes. Such an examination might readily have disclosed material facts or characteristics of the defendant which might have defeated his purpose to secure a disqualification on mental grounds, as will more fully appear from the subsequent recital.

Third, the defendant contends that the proof was insufficient to justify a conviction on either charge, because the evidence showed that the defendant was in fact disqualified from service in the armed forces in that it was found that he was a schizophrenic and was suffering from a severe case of hemorrhoids, and that either defect would have been sufficient disqualification. The examining physicians noted on the defendant's papers as the result of their observations and the information received from him that he was a schizophrenic subject to "paranoid reactions; fearful of being with people, becomes very anxious". Undoubtedly this evidence tends to show that the defendant was mentally and physically disqualified from service; but on the other hand, there was evidence that the physical disqualification might have been remedied by an operation; and that the finding of the physicians as to the defendant's mental condition was the result of various false statements made by the defendant as the result of instructions given him by Ruby during the course of the conspiracy. A more complete picture of the defendant's activities in civil life and his mental capacity will be gathered from the following summary of evidence offered by the government.

On June 23, 1941 Denny stated in his answers to the questionnaire required of him as a registrant that he was 26 years of age; that to the best of his knowledge the only physical or mental defect he had was hemorrhoids; that he had completed eight years of elementary school, and no years of high school; that he was a real estate broker earning $50 a week and that the only property which he owned, exclusive of personal effects, consisted of cash in the amount of $500; that his mother was dependent on him for support and that he had contributed $300 in the preceding year to the support of his wife who, on account of ill health, was living with her parents; and that in his opinion he should be classified in Class 3. He was accordingly classified in Class 3 on November 7, 1941.

On September 6, 1943 he was classified 1-A, fit for military service, after he had undergone a physical examination. On October 1, 1943 he was placed in Class 2-A after he had filed a letter and affidavit as to his occupational classification. In these papers he stated he was the owner, operator and manager of a small hotel in Baltimore City, acquired in 1942, in which he had invested his life savings in excess of $30,000; that the hotel had 56 rooms and was filled to its capacity, for the most part with defense workers, and that he gave twelve hours a day, seven days a week, to the work and was assisted by ten employees. He stated that it would take him three months to get a qualified manager and superintendent to take charge of the business. On December 17, 1943 he was reclassified in Class 1-A. On January 7, 1944 he appeared before the Board and stated that he was the sole owner of one hotel and the manager of two others, and was in the midst of a remodeling job which

would take until the middle of February to complete. He asked for deferment of service and was deferred until March 1, 1944.

This was the situation when Denny was introduced to Chester T. Ruby, Chief Petty Officer, United States Navy, who was stationed at the Fifth Regiment Armory Induction Station in Baltimore City and had charge of enlisted personnel, with the duty to keep them in order and expedite them as they came in and out of the Armory in the course of their examination. The introduction was brought about by Private Denny of the United States Army, a brother of the defendant, who was also stationed at the Armory. During the conversation Denny offered Ruby passes to prize fights to be held in Baltimore and arranged to telephone Ruby at his home, using the assumed name of Harris, the understanding being that when Ruby received such a message from the defendant he was to meet him on the following evening at a certain parking lot in the city. Later Ruby received such a message and met Denny, in accordance with the agreement. The latter inquired whether Ruby could help him to secure a rejection at the Armory. Ruby agreed and it was arranged that they were to meet again when Denny should receive a notice from the Draft Board to report for his physical examination. When the notice was received the two men met at the appointed place, and Ruby instructed Denny what to say to the doctors at the station in regard to his mental and physical condition. Ruby instructed the defendant to exaggerate his defective physical condition and to take other steps that would affect his appearance when placed under examination for mental defects. Denny was instructed to keep his clothes on and to stay awake the night previous to the day of the examination, not to shave or wash in the morning, to walk up and down for two hours before coming to the Armory, and to appear nervous and tired; to say that he had severe headaches, dizzy spells and that it was his custom, after engaging in a business transaction, to retire to his room and remain there for two or three weeks, coming out only for meals, and to say further that he was willing to go into the service if he could be put in some branch where he would be alone and nobody would be with him. Ruby further instructed Denny to say that he was a graduate from a high school for the reason above set out. At

this meeting it was agreed that Denny should pay Ruby $300 for his services if Denny should be rejected. Denny followed the instructions and convinced the physicians that he was a schizophrenic, and was rejected as unfit for service on March 22, 1944. The following week the conspirators met again and the money was paid.

At the time of the trial Ruby had already been convicted in the District Court in other cases for conspiring with other inductees and for aiding and abetting them to evade the draft, and was serving a sentence of twelve years in the penitentiary. His testimony as to the meetings with Denny from time to time on the parking lot was corroborated by two F.B.I. agents who had Ruby under surveillance and who observed that the meetings took place. The testimony of Ruby, tending to show that Denny's desire to avoid crowds and to seclude himself from contact with others was not genuine but assumed in order to deceive the physicians, was corroborated to some extent by testimony offered on Denny's behalf that he sometimes attended prize fights at which large crowds were present.

■ We think it is obvious from this recital that there was substantial evidence to go to the jury in support of the charges contained in both indictments. It is not impossible that the doctors were deceived as to Denny's mental condition by the statements which he made under Ruby's direction; but in any event the evidence offered by the government tended to sustain the charges in both indictments. There is no suggestion that Denny was so mentally incapacitated as to be incapable of the commission of crime, and if the government's evidence was true, the crimes were committed whether or not Denny was actually unfit for military service.

In addition to the evidence outlined above, the government offered a confession made to two F.B.I. agents and signed by Denny on June 2, 1944 wherein he admitted that he had agreed to pay Ruby $250 to secure his rejection from the draft and had paid this sum after the rejection took place. The final contention of the defendant is that he was prejudiced by the admission of the confession in evidence over his objection, because the confession was extracted from him by promises and threats of the government agents and should therefore have been rejected under the familiar rule.

The testimony in respect to the circumstances under which the confession was given is conflicting. Denny testified that he was induced by a government agent to go to the F.B.I. office in Baltimore in order to give information about a woman of his acquaintance who was under investigation; that he was questioned briefly about the woman by this agent and then suddenly both agents began to question him about Ruby and he was told that if he did not tell everything about Ruby, it was going to be very tough for him but if he talked frankly, nothing would come of it. When he revealed nothing he was accused of lying. He was suffering from a headache and the examination was conducted in a small, badly-ventilated room on a very hot day and he was refused permission to leave the room. Finally, after more than two hours of persistent questions and threats, he felt that he was going to collapse and so, in order to escape, he signed the papers which the officers presented to him.

The substantially different testimony of the agents may be summarized as follows: Denny was invited to their office and was questioned by one of them for about one-half hour concerning the woman above mentioned; then both agents questioned him about Ruby after having told him that he did not have to give information if he did not desire to do so. He thereupon proceeded to tell about his selective service status and his association with Ruby and his payment of money to Ruby in rather complete detail. No threat was made and no promise was offered him, and he was not forbidden to leave the room. The paper was then prepared by one of the officers and was signed by Denny on each page. After he had signed it, and during the last quarter of an hour of the interview, he became much disturbed about the serious situation in which he had been placed and the publicity to which he would be subjected. He became so wrought up that one of the agents feared he might commit suicide and endeavored to calm and reassure him by telling him that the facts would be reported to the United States Attorney for decision and that it did not necessarily follow that he would be subjected to prosecution because he had made the statement.

The testimony as to the confession was taken in the presence of the jury at the suggestion of the defendant's attorneys, and at its conclusion, the objection to the admissibility of the evidence was overruled by the judge with the statement that the jury would later be instructed as to how to treat the evidence when considering their verdict. Subsequently, during the charge of the court, the jury were told to disregard the confession unless they found that it was the voluntary act of the defendant uninfluenced by threats or promises. This procedure was approved in Wilson v. United States, 162 U.S. 613, 624, 16 S.Ct. 895, 900, 40 L.Ed. 1090, where the court said:

"When there is a conflict of evidence as to whether a confession is or is not voluntary, if the court decides that it is admissible, the question may be left to the jury, with the direction that they should reject the confession if, upon the whole evidence, they are satisfied it was not the voluntary act of the defendant."

This case was recently cited with approval in Lisenba v. California, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166, note 16. We have examined the testimony in the record in the pending case bearing on the admissibility of the confession and we find no reason to reject the determination of the District Court. In reaching this conclusion we have followed the rule laid down in recent decisions of the Supreme Court. In Lisenba v. California, 314 U.S. 219, 237-8, 62 S.Ct. 280, 290, 86 L.Ed. 166, the court said:

"Where the claim is that the prisoner's statement has been procured by such means (threats or promises), we are bound to make an independent examination of the record to determine the validity of the claim. The performance of this duty cannot be foreclosed by the finding of a court, or the verdict of a jury, or both. If the evidence bearing upon the question is uncontradicted, the application of the constitutional provision is unembarrassed by a finding or a verdict in a state court; even though, in ruling that the confession was admissible, the very tests were applied in the state court to which we resort to answer the constitutional question.

"There are cases, such as this one, where the evidence as to the methods employed to obtain a confession is conflicting, and in which, although denial of due process was not an issue in the trial, an issue has been resolved by court and jury which involves an answer to the due process question. In such a case we accept the deter-

mination of the triers of fact, unless it is so lacking in support in the evidence that to give it effect would work that fundamental unfairness which is at war with due process."

In Lyons v. Oklahoma, 322 U.S. 596, 602, 64 S.Ct. 1208, 1212, 88 L.Ed. 1481, the court said:

"When conceded facts exist which are irreconcilable with such mental freedom, regardless of the contrary conclusions of the triers of fact, whether judge or jury, this Court cannot avoid responsibility for such injustice by leaving the burden of adjudication solely in other hands. But where there is a dispute as to whether the acts which are charged to be coercive actually occurred, or where different inferences may fairly be drawn from admitted facts, the trial judge and the jury are not only in a better position to appraise the truth or falsity of the defendant's assertions from the demeanor of the witnesses but the legal duty is upon them to make the decision. Lisenba v. California, supra, 314 U.S. 219 at page 238, 62 S.Ct. 280, 86 L.Ed. 166."

Affirmed.