## YOST v. UNITED STATES.

### No. 5485.

Circuit Court of Appeals, Fourth Circuit.

July 27, 1946.

M. William Adelson, of Baltimore, Md. (Wilfred T. McQuaid, of Baltimore, Md., on the brief), for appellant.

Bernard J. Flynn, U. S. Atty., of Baltimore, Md., for appellee.

Before GRONER, Chief Justice, United States Court of Appeals for District of Columbia, and SOPER and DOBIE, Circuit Judges.

GRONER, C. J.

The events out of which this prosecution arose occurred in the early part of 1944. Appellant was then a man thirty-four years old, marr'·d and with·a child ten years of age. He had registered for the draft in October, 1940, and in his questionnaire had answered that he had no physical defects except poor vision. Under the rules then obtaining with relation to married men he was placed in a deferred classification. In 1944 he was reclassified as 1-A and notified to appear for physical examination, but was subsequently rejected as physically unfit because of a finding of "inadequate personality."

Some months thereafter he was twice indicted, one indictment charging conspiracy with one, Chester T. Ruby, to evade military service by making false statements to the examining psychiatrist as to his fitness for service; the other, charging the making of such false statements to the examining psychiatrist with the purpose of having the examiners reject him for military service. The two indictments were consolidated for trial, and on the trial he was convicted under the conspiracy indictment, but acquitted under the indictment charging the making of false statements to the examiners.

▇▇ At his trial, the Government relied wholly upon a statement made by appellant to Federal Bureau of Investigation Agents when interrogated by them as to the circumstances of his rejection, and on this appeal the questions presented relate entirely to (a) the admissibility of the statement in evidence and (b) whether, if properly admitted, the statement was itself sufficient to warrant submission of the question of guilt to the jury. We have examined the record carefully and have reached the conclusion that the statement was properly admitted.[1] But we are even

---

[1] Denny v. United States, 4 Cir., 151 F. 2d 828, 832, 834.

more strongly of opinion that when it is considered with the other evidence in the case, there is a total lack of any substantiation of the charge of conspiracy to commit an offense against the United States. In this view, appellant's motion in the court below for an instructed verdict of not guilty should have been granted.

Appellant at the time of his arrest was employed by the Baltimore Sun, as a newspaper distributor over a specified city route. Ruby, with whom he is charged with conspiring, likewise had such a route. Appellant, learning that Ruby's collections from his newspaper customers had gotten behind, volunteered to help him and collected small sums of money due Ruby, which from time to time he turned over to Ruby or his wife. Ruby was also a petty officer in the Navy, stationed for the time being at the Induction Center in Baltimore, for the purpose of keeping order and maintaining the lines, and appellant, hearing of Ruby's connection in this respect, had several talks with him in which he sought information as to the time he would probably be called for induction.

In the early part of 1944 appellant told Ruby that he had received his 1-A classification, and Ruby told him not to worry but to let him know when he was to report for his physical examination. When appellant received his orders he informed Ruby, and the latter told appellant's wife to have appellant come to see him. This appellant did, and the statement which he subsequently made to the Federal Agents was largely a recital of that and various other conversations with Ruby. The incriminating part of the statement is that when he met Ruby, in response to the latter's telephone call, "He [Ruby] then told me that when I came to the psychiatrist during the physical examination that I should be sure and remember to tell him that I do not like people and do not like crowds. He also instructed me to tell the psychiatrist that I liked to work alone away from people. I wish to point out that Ruby had previously asked me if I had any known physical defects and at that time I had told him that I had kidney trouble. At the time of the counselling on what to tell the psychiatrist Ruby also told me to state that I wet the bed." The statement continued to the effect that when appellant went home he discussed what Ruby had told him with his wife and that they were both of opinion that Ruby's suggestions were too simple to fool a psychiatrist, and that it was only a means Ruby took of getting rid of appellant.

Appellant then related that he followed the instructions, and after his examination was told by the examiners that he did not meet the requirements and would not be inducted. The statement concluded with a declaration that Ruby had not at any time requested any money for his advice, but that it was understood it was given in payment of the collecting appellant had done for Ruby on his newspaper route. The statement does not purport to be in appellant's language, but was a summation of what appellant had told the officers, couched in their own words, and was signed by appellant. In this connection it is proper to point out, however, that on the cross-examination of the officers, they admitted that appellant had said to them at the time he gave his statement that all Ruby had told him to say was a repetition of what he had formerly told Ruby was his condition at the time, and was in all respects true. The officers, however, omitted all reference to this in drawing up the statement.

In the argument on the appeal counsel for the Government very frankly stated to us that the case against appellant could not be proved and was not proved independently of the statement to the Federal officers. The question in the case, therefore, is whether there was sufficient extrinsic corroboration, when considered in connection with the statement, to establish guilt beyond a reasonable doubt.

The Government called Ruby as its principal witness. He testified that he first met appellant at the business office of the newspaper some time before the occurrences in question and while they were both waiting for their papers. At that time they had some conversation on the subject of the difficulties of making collections from their respective customers. As the result of this and subsequent meet-

ings appellant had volunteered to help Ruby collect from his delinquent patrons. Ruby further testified that it was only after appellant had made some collections for him that appellant learned that Ruby was in the Navy; that he (Ruby) saw appellant at his house only once, though appellant had called there several times to turn over the small sums of money he had collected to Ruby's wife; that the first time they had discussed appellant's draft status appellant had asked him some questions in relation to when he would be called and such matters, and he (Ruby) had told him not to worry about the matter, but to let him know the day he was coming up before the Board and he would give him any help he could. Government counsel asked Ruby if he had instructed appellant what to tell the psychiatrist, and he replied that when appellant had told him certain things as to his condition, he told appellant to be sure and tell the same things to the doctors. Appellant had then replied, in substance, that he did not want to tell about his physical troubles. Ruby further testified that he told appellant— "* * * if the conditions he told me were the truth, to be sure and tell the doctors, and he would be rejected. And * * * I will be over there to help you in any way I can." And again, "I told him if he had any known physical defects, or mental defects, to be sure and tell the doctors, and * * * in our talk he said he had a condition there that,—well, he wet the bed. So I said 'Be sure and tell that to the doctors.'"

The sum and substance of Ruby's testimony was a complete and absolute denial that he had ever, in consideration of money or services, or a bargain or agreement or otherwise, done anything to assist appellant to obtain his rejection from induction into the service. He denied that there was any plan or design at any time between them to have appellant evade the draft, but only friendly advice intended to keep up his spirits and to prevent his being afraid when he came before the examiners. In short, Ruby considered appellant "a queer sort of fellow," whom he tried to keep cheerful so that he would get through the ordeal as quickly as possible and urged

him to tell the doctors only the truth as to his condition.

The other Government evidence was equally bootless of result in establishing a conspiracy or criminality on appellant's part. The two doctors who examined appellant on his call for induction both testified for the Government. Dr. Taneyhill, who examined him first, said that he was disposed to reject appellant after questioning him, but chose Dr. Elgin as a consultant because of the latter's greater experience with the type of person appellant seemed to be. Dr. Elgin as a result of his examination found appellant to be physically unfit. Under the lines for psychiatric and neurological symptoms on the form used, he made the notation—"Sensitive, seclusive, works alone, schizoid behavior." This doctor testified appellant was not rejected for psychiatric reasons, but rather that his findings were based on appellant's attitude and behavior as well as from what he said, and that he independently arrived at the conclusion that he was not adequate for military service. The other witnesses added nothing to the Government's case. Appellant's testimony and that of his witnesses established that he was a man of good conduct and behavior, that his idiosyncrasy was to work by himself and to associate as little as possible with other people. Outside of his dog, who went with him on his daily rounds, he had no companions. His kidney condition and the fact that he was unable to control himself and at night wet the bed were well known in his family, and his father testified that it had extended over a long period prior to his call for induction. There was no evidence that any statements he made to the examining officers at the Induction Center were untrue, and the jury on the second indictment found the fact to be that they were not untrue.

Appellant's own testimony was straightforward and in substance was in all material respects like that he gave the officers in his signed statement. He stated frankly that he discussed with Ruby whether he was obliged to tell the officers of his physical ailment, of which he was ashamed and wanted to conceal, and that

Ruby advised him to tell only the truth and nothing more; that the services he had performed for Ruby in assisting him in collecting arrearages from his patrons were given willingly and gratuitously, long before he knew anything about Ruby's connection with the Induction Center. He denied that there was any bargaining or agreement or understanding with Ruby, or that the latter was to do anything or advise or counsel him in any way contrary to the truth in relation to his draft status. It is impossible to read the whole evidence, including appellant's own, without reaching the definite conclusion that he was not a normal person, or that his statement to Ruby and his subsequent statement to the doctors that he disliked crowds or association with people was either untrue or exaggerated. The case, therefore, without the statement to the Federal officers is consistent only with his innocence of the charge on which he was convicted. And the statement itself, though it contains implications of a conspiracy, wholly fails to contain any positive assertion that the statements Ruby told appellant to make were untrue. But even if it be conceded that the statement was a confession of guilt of conspiracy—which we think would be going very far—, the most careful search of the record fails to show that degree of corroboration which in the circumstances would justify a conviction. For nothing is better established than that there can be no conviction of an accused in a criminal case upon an uncorroborated confession,[2] and certainly the corroboration in this case, given its broadest import, wholly fails to include any substantial evidence of the corpus delicti. If in this case there were, independently of the confession, substantial evidence of the corpus delicti, or if it were shown that such evidence and the confession were together convincing beyond a reasonable doubt, the verdict of the jury and the judgment of the court below would have to stand. But in the present case, exclusive of the "statement," there is not a word of effective evidence, direct or circumstantial, from which any jury could properly conclude that there was an unlawful combination, confederacy, agreement or conspiracy between appellant and Ruby to cause appellant's rejection when he answered the call for induction into the military service.

Accordingly, we are required under the rule applied by us in Tabor v. United States, 4 Cir., 152 F.2d 254, to reverse the judgment and remand the case to the District Court for further proceedings in accordance with this opinion.

Reversed.

---

[2] Forte v. United States, 68 App.D.C. 111, 94 F.2d 236, 127 A.L.R. 1120, and the cases cited there. See also Warszower v. United States, 312 U.S. 342, 347, 61 S.Ct. 603, 85 L.Ed. 876, where the rule is stated and recognized.